**HOUSATONIC CABLE
VISION COMPANY**

v.

**DEPARTMENT OF PUBLIC UTILITY
CONTROL, et al.**

No. H–85–502 (MJB) Civil.

United States District Court,
D. Connecticut.

Nov. 22, 1985.

**800**

William M. Rubenstein, Howard L. Slater, Thomas A. Rouse, Byrne, Slater, Sandler, Shulman & Rouse, Hartford, Conn., for plaintiff.

Barry S. Zitser and Valerie J. Bryan, Div. of Consumer Counsel, New Britain, Conn., Joseph I. Lieberman, Atty. Gen., and Clarine N. Riddle, Ass't. Atty. Gen., Hartford, Conn., for defendants.

## RULING ON PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION AND ON DEFENDANTS' MOTION TO DISMISS

BLUMENFELD, Senior District Judge.

This motion for a preliminary injunction, which has been consolidated with a consideration of the merits of the case, raises an issue concerning the interpretation of a recently-enacted statute, the Cable Communications Policy Act of 1984 (the "Cable Act"). Plaintiff Housatonic Cable Vision Company ("HCV") seeks to enjoin the Department of Public Utility Control and the Attorney General of Connecticut from enforcing a state regulation and two orders entered against HCV pursuant to that regulation, and from proceeding with administrative hearings concerning the regulation and orders. Plaintiff has also requested declaratory relief in the form of a declaration by this court that the regulation and orders are preempted by the Cable Act and are no longer of any force and effect.

Defendants have moved to have the action dismissed for failure to exhaust state administrative and judicial remedies, or on abstention grounds.

FACTS

The State of Connecticut historically has regulated cable television systems on a state-wide basis in the same manner as public utilities through the Department of Public Utility Control ("DPUC").[1] Conn. Gen.Stat. §§ 16–1 *et seq.* In order to construct or operate a cable television system, a cable operator was required to obtain a certificate of public convenience and necessity from the DPUC. Conn.Gen.Stat. § 16–331. Such a certificate, issued after a public hearing, authorized the holder to operate its service within a specified territory for a 15-year period. Because only one certificate was issued for each area, a cable operator holding a certificate enjoyed a monopoly within its territory. The DPUC had statutory authority to regulate cable operators on an ongoing basis by "specify[ing] in the certificate at the time of issue and from time to time thereafter such terms and conditions as the public interest may require" and also "[f]or due cause shown, ... [to] amend, suspend or revoke any such

---

1. The Department of Public Utility Control has gone by other names in the past. For simplicity, throughout this opinion the term DPUC will be used to refer to the Department of Public Utility Control and its predecessors in name.

certificate." Conn.Gen.Stat. § 16–331(a). Over the years, the DPUC exercised its regulatory authority to establish and occasionally to alter line extension requirements for cable operators.

HCV holds the franchise to provide cable television service to Area 8, which includes the towns of Brookfield, New Fairfield, Monroe, Newton, Sherman, and Trumbull. HCV applied for this franchise in 1975. The company asserts that it emphasized in its original application and in the memorandum that it filed in support of that application that it did not intend to provide service to the entire franchise area. Rather, it proposed to provide access to cable service to 62% of potential subscribers within the first three years of service and indicated that thereafter market forces would dictate the schedule of construction, with further line extensions depending on the acceptance of the service in the previously-wired areas and the existence of firm orders in unwired areas.

The DPUC issued a certificate of public convenience and necessity for Area 8 to HCV on October 13, 1976. At that time, the DPUC's line extension policy required all cable operators to wire 20% of their franchise areas each year until they had provided service to 100% of their areas. The DPUC had implemented this policy in 1972 by adopting regulations amending all existing cable certificates. *See* Finding & Order, Public Utilities Commission Docket No. 11343, Nov. 10, 1972 (Defendants' Exhibit 7).

The DPUC altered its line extension regulations in 1978 by adopting Section 16–333–13 of the Regulations of Connecticut State Agencies. *See* Public Utilities Control Authority Docket No. 760207 (Defendants' Exhibit 11). A subsequent revision of Section 16–333–13 on September 4, 1980 established the line extension regulation at issue in this case. The revised regulation provides in relevant part:

(c)(2) Each franchise holder shall, upon completion of the construction (in the primary area) extend energized trunk and feeder, at no charge, to all areas within the franchise territory where there are at least: 1) 25 prospective subscribers per aerial plant mile extension or 2) 50 prospective subscribers per underground plant mile of extension. The construction required by this section shall be completed at a rate specified in the company's tariffs, filed pursuant to subsection (d) of these regulations and approved by the DPUC.

(d)(1) Each franchise holder shall, within 30 days of effective date of these regulations, ... file proposed tariffs or tariff revisions which shall specify the obligation of the franchise holder regarding service to all areas where such service is not provided for in these regulations.

(2) All tariffs and tariff revisions are subject to approval by the DPUC.

Conn.Agencies Regs. § 16–333–13.

HCV filed a proposed tariff with the DPUC on October 2, 1980, which it revised on August 21, 1981. In its tariff, HCV claimed that the regulation imposed a financial burden upon it and proposed a graduated construction schedule. HCV also claimed that it would not be economically feasible to wire sparse areas [2] without charging customers in those areas contributions in aid of construction to help finance the extensions.

The DPUC held a hearing on HCV's proposed tariffs on August 31, 1981 and issued a decision on July 20, 1982 denying the proposed tariffs and requiring HCV to file a new set of tariffs. At that time the DPUC ordered HCV to construct all tertiary areas [3] by December 31, 1983, and to

---

**2.** "Sparse areas" is the term used by HCV to describe areas within the franchise territory where there are fewer than 25 prospective subscribers per aerial plant mile of extension and/or fewer than 50 prospective subscribers per underground plant mile of extension. *See* Tariffs Filed October 2, 1980, Appendix to Affi-

davit of Edward J. Bennett dated June 12, 1985, Exhibit E.

**3.** "Tertiary areas" are those areas, described in subsection (c)(2) of the Line Extension Regulation, in which there are at least 25 prospective subscribers per aerial plant mile or 50 prospective subscribers per underground

construct sparse areas at a rate of not less than 60 miles per year. The order also prohibited HCV from demanding contributions in aid of construction from subscribers in sparse areas. This order ("Line Extension Order") is one of the orders that HCV is now challenging.

On August 19, 1982, HCV filed a petition for rehearing and reconsideration, which the DPUC denied. HCV appealed the denial in Connecticut Superior Court but apparently has not pursued that appeal. On December 1, 1983, HCV filed a motion with the DPUC to reopen and modify the Line Extension Order. The DPUC granted that motion on December 20, 1983, and directed HCV to continue to comply with the previously-ordered schedule for constructing sparse areas pending reconsideration. The DPUC took no further action until March 25, 1985, when it issued a notice that the HCV hearing was being reopened for reconsideration of the Line Extension Order.

In the meantime, Congress had enacted legislation aimed at restructuring and harmonizing the regulation of cable television by setting certain federal standards. The Cable Communications Policy Act of 1984 ("Cable Act") was passed on October 11, 1984 and became effective on December 29, 1984. The Cable Act, codified at 47 U.S.C. §§ 521 *et seq.*, contains a broad range of provisions governing various aspects of cable television regulation. While the Act provides in one section that state laws and regulations inconsistent with it are preempted and superseded, 47 U.S.C. § 556, other sections specifically preserve provisions of existing franchises and of state law, *e.g.*, 47 U.S.C. §§ 557(a), 544(c). This combination of preemption and preservation has generated considerable controversy as to the extent of the Cable Act's preemptive effect.

Informed of the reactivation of the hearing before the DPUC, HCV filed a motion to dismiss with the DPUC on the ground that the Cable Act had preempted the DPUC's jurisdiction over line extension requirements. At the reopened hearing, held

plant mile of extension. *See* Appendix to Affi-

on April 4, 1985, the DPUC ordered HCV to file exhibits relating to changes in conditions in its franchise area since the 1982 Line Extension Order. These exhibits were to be filed within three months following a decision on the pending motion to dismiss if that decision were adverse to HCV. On April 24, 1985, the DPUC denied the motion to dismiss and ordered HCV to file its exhibits within three months ("1985 Order"). This 1985 Order is the second order that HCV is now challenging.

On June 12, 1985, HCV filed its complaint in this federal court action, seeking to enjoin enforcement against it of the Line Extension Regulation and the two DPUC Orders; to enjoin any future DPUC proceedings concerning these matters; and to obtain a declaration that the Regulation and the two Orders are preempted by the Cable Act.

## DEFENDANTS' MOTION TO DISMISS

The defendants have moved this court to dismiss the case. Defendants assert two grounds for dismissal: (1) that plaintiff has failed to exhaust its state judicial and administrative remedies, and (2) that this is an appropriate case for federal court abstention. These contentions must be addressed at the outset, since either one could signal an absence of jurisdiction in this court to decide the case.

### I. *Failure to Exhaust State Remedies*

The defendants argue that HCV has several state remedies available to it and should be required to exhaust those remedies before seeking relief in federal court. According to the defendants, these remedies include continued participation in the reopened hearing before the DPUC, with an eventual review in Connecticut state courts in the event of a final decision adverse to HCV, and resumption of its earlier appeal in superior court of the denial of its motion to reconsider. In addition, the defendants argue that HCV can seek modification of its franchise obligations through the modification process contained in the Cable Act.

davit of Edward J. Bennett, Exhibit E.

Where a plaintiff institutes a declaratory judgment action in federal court seeking a determination of an issue of federal law that the plaintiff fears will become an issue in a future state action against it, the federal court may lack jurisdiction to hear the case. *See Public Service Commission v. Wycoff,* 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952). Such a case presents several problems that warrant dismissal for failure to exhaust state remedies. Where no state action has yet been brought against the federal plaintiff, the controversy between the parties is not concrete and in fact may never come into being. *Wycoff,* 344 U.S. at 245, 73 S.Ct. at 241; *Braniff International, Inc. v. Florida Public Service Commission,* 576 F.2d 1100, 1105 (5th Cir.1978). Without a case or controversy before it, the federal court lacks jurisdiction to decide the question. U.S. Const. art. III; *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 239–41, 57 S.Ct. 461, 463–64, 81 L.Ed 617 (1937). In addition, such a case arguably does not present a federal question, but only a federal defense to a state law claim, which does not suffice to give the federal court subject matter jurisdiction. *See Louisville & Nashville R. Co. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908).

█ The foregoing analysis does not apply to the present case, however. A plaintiff who seeks both declaratory and injunctive relief, on the grounds of federal preemption, against a state law that has already been applied to that plaintiff is not required to exhaust all available state remedies before seeking relief in federal court. *Public Utilities Commission of California v. United States,* 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958); *Stone & Webster Engineering Corp. v. Ilsley,* 690 F.2d 323 (2d Cir.1982), *aff'd mem.,* 463 U.S. 1220, 103 S.Ct. 3564, 77 L.Ed.2d 1405 (1983); *Braniff International, Inc. v. Florida Public Service Commission,* 576 F.2d 1100 (5th Cir.1978). Where the state has "plainly indicated an intent to enforce [its law]" against the plaintiff, the controversy between the parties is "present and concrete." *Public Utilities Commission of California,* 355 U.S. at 538–39, 78 S.Ct.

at 450. A plaintiff requesting an injunction is not only asserting a right under federal law on the face of its complaint but is also seeking affirmative relief to prevent interference with that right. *Stone & Webster Engineering Corp.* 690 F.2d at 327. Finally, the fact that the plaintiff is alleging federal preemption makes a state exhaustion requirement particularly inappropriate. As the Supreme Court has noted, "where the only question is whether it is constitutional to fasten the administrative procedure onto the litigant, the administrative agency may be defied and judicial relief sought as the only effective way of protecting the asserted constitutional right." *Public Utilities Commission of California,* 355 U.S. at 540, 78 S.Ct. at 450–51.

The Second Circuit addressed this issue in *Stone & Webster Engineering Corp. v. Ilsley,* 690 F.2d 323 (2d Cir.1982), a challenge to a state law allegedly preempted by ERISA. The Connecticut Workers Compensation Commissioner had issued a "Finding and Award" requiring Stone & Webster to comply with a state statute. Stone & Webster appealed the decision through state administrative channels and, while that appeal was pending, instituted an action in federal district court to enjoin enforcement of the statute and the Finding and Award. *Id.* at 325–26. The Second Circuit Court of Appeals affirmed the district court's holding that federal question jurisdiction existed. The court stated in its opinion:

> Plaintiff's claim here is not only one which originates from a federal statute, but is one whose vindication turns upon preemption expressly contained in it. Under these circumstances a declaratory plaintiff can come into federal court asserting that preemption affords it insulation from a state-based claim.

*Id.* at 328. The court also noted that the fact that the plaintiff's claim could perhaps have been litigated in Connecticut state courts would not displace federal court jurisdiction. *Id.* at 326 n. 3.

■ In the present case, HCV is challenging a state regulation that has already been specifically applied to it through state administrative proceedings, and administrative orders that it is under a present obligation to obey.[4] HCV is seeking both declaratory and injunctive relief on the grounds that the state's power to enforce the Regulation and Orders had been preempted by a federal statute. Under these circumstances, the plaintiff need not proceed exclusively through state mechanisms. The plaintiff's federal court action is proper and will not be dismissed for failure to exhaust state remedies. *See also Braniff International, Inc. v. Florida Public Service Commission*, 576 F.2d 1100 (5th Cir.1978); *Safeway Stores, Inc. v. Board of Agriculture of Hawaii*, 590 F.Supp. 778 (D.Haw.1984); *Town of Springfield v. McCarren*, 549 F.Supp. 1134 (D.Vt. 1982), *aff'd mem.* 722 F.2d 728 (2d Cir.), *cert. denied*, 464 U.S. 942, 104 S.Ct. 360, 78 L.Ed.2d 322 (1983); *Town of Springfield v. State of Vermont Environmental Board*, 521 F.Supp. 243 (D.Vt.1981).

## II. *Abstention*

■ The defendants also urge the court to dismiss this case on federal abstention principles. Abstention, of course, is not a single doctrine; several distinct lines of cases have developed defining various circumstances in which a federal court should refrain from exercising its jurisdiction in deference to considerations of comity and federalism. *See, e.g., Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). Although defendants have assembled strands from each of these lines of cases in support of their argument, I find that none of the abstention doctrines applies to this case.

■ The doctrine of abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1062–63, 3 L.Ed.2d 1163 (1959). A district court should abstain only when exceptional circumstances exist to support that result. *Colorado River Water Conservation District v. United States*, 424 U.S. at 813, 96 S.Ct. at 1244; *Marshall v. Chase Manhattan Bank (N.A.)*, 558 F.2d 680 (2d Cir. 1977). The various abstention doctrines delineate the circumstances in which it is proper for a federal court to abstain.

■ 1. One such circumstance is where a case presents both a federal constitutional question and unsettled questions of state law, and a resolution of the state law questions may eliminate the need to reach the federal constitutional question. *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *Pullman* abstention is inappropriate in this preemption case, where the issue is a question of the interpretation of the Cable Act, a federal statute. *Chemical Specialties Manufacturers Association, Inc. v. Lowery*, 452 F.2d 431, 433 (2d Cir.1971) (refusing to abstain in preemption case where "such difficulties in statutory construction as exist pertain rather to the relevant federal laws").

2. A second circumstance justifying abstention is where a case involves an essentially local issue arising out of a complicated state regulatory scheme. *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). *Burford* abstention is appropriate "when a state has established an administrative framework to formulate policy and decide cases in an area of legitimate state interest." *Arden House, Inc. v. Heintz*, 612 F.Supp. 81, 86 (D.Conn.1985)

---

**4.** The parties stipulated prior to the hearing on this motion that the defendants would not take any action to enforce the Line Extension Regulation or the Line Extension Order against HCV during the pendency of this litigation, or take any action which has the purpose or effect of penalizing HCV based upon the Regulation or

Order. It was also stipulated that the exhibits required by the 1985 Order need not be filed until 30 days following a final judgment, and subject to HCV's right to seek further extensions of time from the appropriate authority if necessary.

(Clarie, J.) (quoting *St. Joseph Hospital v. Electronic Data Systems Corp.*, 573 F.Supp. 443, 451 (S.D.Tex.1983)). A fundamental element of *Burford* abstention is thrown into doubt in a preemption case. The fact that Congress has created a statutory scheme and included an express preemption provision that arguably covers the state action in question weakens any argument that there is a legitimate state interest in regulating that area. *See International Brotherhood of Electrical Workers v. Public Service Commission*, 614 F.2d 206, 213 (9th Cir.1980). Regardless of whether the Cable Act in fact preempts the specific actions of these defendants, it unquestionably removes much of the power that the DPUC historically has had to regulate cable operators, and indicates a Congressional intent to create significant federal involvement in this area.

3. Finally, *Younger v. Harris* and the cases following it hold that a federal court should abstain from enjoining ongoing state proceedings. *E.g., Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Younger* abstention first arose in the context of state criminal proceedings, but has been extended in some circumstances to cases involving civil proceedings, *Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *Huffman v. Pursue*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); and even state administrative proceedings, *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

The Second Circuit has specifically held that *Younger* abstention is not appropriate in a preemption case. *Stone & Webster Engineering Corp.*, 690 F.2d at 326 n. 2; *Marshall v. Chase Manhattan Bank*, 558 F.2d at 684. The *Younger* doctrine only applies in instances where the ongoing state proceeding provides a fair forum for the federal plaintiff's federal claims. *Silver v. Woolf*, 538 F.Supp. 881, 884 (D.Conn.), *aff'd*, 694 F.2d 8 (2d Cir.1982), *cert. denied*, 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983). That requirement is not met here. The purpose of the DPUC

hearing is to decide whether to release HCV from its obligations under the regulation, not to assess the validity of that regulation under federal law. In holding the proceeding, the state agency has necessarily assumed its power to do so. The concerns for comity and federalism that underlie federal abstention in the face of ongoing state enforcement efforts are reduced when the plaintiff's claim is that those state efforts are preempted by federal law. *Chemical Specialties Manufacturers Association, Inc. v. Lowery*, 452 F.2d 431, 433 (2nd Cir.1971) ("abstention is peculiarly inappropriate when the federal claim is that the state has been ousted from jurisdiction"); *Town of Springfield v. McCarren*, 549 F.Supp. at 1153 ("the customary deference to state enforcement efforts is suspended when ... the plaintiffs' challenge is that those efforts are preempted under the Supremacy Clause").

Finally, abstention in this case would amount to imposing a state exhaustion requirement that has already been found to be inappropriate. *See Silver v. Woolf*, 538 F.Supp. at 885.

Having found that dismissal of this case is not warranted either for failure to exhaust state remedies or under principles of abstention, I now turn to the question of preemption.

### III. *Preemption*

The basic principles of federal preemption of state law are well-settled. Under the Supremacy Clause of the Constitution, the law of the United States is "the supreme Law of the Land ...., any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, where state laws come into conflict with federal law, the state enactments cannot stand.

The Supreme Court has developed a two-step inquiry for determining when a federal law preempts state law. The first inquiry is whether Congress has prohibited state regulation of the area in question entirely. *Pacific Gas & Electric Co. v.*

*State Energy Resources Conservation and Development Commission,* 461 U.S. 190, 203, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983); *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); *Mobil Oil Corp. v. Dubno,* 492 F.Supp. 1004, 1009 (D.Conn. 1980), *appeal dismissed in relevant part,* 639 F.2d 919 (2d Cir.), *cert. denied,* 452 U.S. 967, 101 S.Ct. 3122, 69 L.Ed.2d 980 (1981). Congress can accomplish a total displacement of state law either by stating its intent to preempt an entire area expressly in the language of the statute, or by exhibiting an intent to occupy the field implicitly through the structure and purpose of a federal statute. *Jones v. Rath Packing Co.,* 430 U.S. at 525, 97 S.Ct. at 1309.

Even if Congress has not completely ousted state regulation in a field, federal law preempts state law that conflicts with it. *Pacific Gas & Electric Co.,* 461 U.S. at 204, 103 S.Ct. at 1722; *Jones v. Rath Packing Co.,* 430 U.S. at 525–26, 97 S.Ct. at 1309–10. Accordingly, the second inquiry is to determine whether challenged state provisions conflict with federal law. *Jones v. Rath Packing Co.,* at 526, 97 S.Ct. at 1310; *Mobil Oil Corp. v. Dubno,* 492 F.Supp. at 1009. For preemption purposes, a state law is said to conflict with a federal law when, under the circumstances of the particular case, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Jones v. Rath Packing Co.,* 430 U.S. at 526, 97 S.Ct. at 1310; *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

In the Cable Act, Congress recognized the need for regulation on the federal, state, and local levels. 47 U.S.C. § 521(3); H.R.Rep. No. 98–934, 98th Cong., 2d Sess. 3, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4655, 4656. To accomplish the coordination of these various levels of authority, Congress included express preemption provisions in the Act. These provisions do not prohibit state and local regulation completely. The Act provides that:

Except as provided in section 557 of this title ["Existing franchises"], any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded.

47 U.S.C. § 556(c).

At oral argument, HCV characterized section 556(c) as a preemption clause, while the DPUC characterized it as a savings clause; in fact, it is both. By its terms, the Cable Act preempts only state or local laws that are inconsistent with it; it follows that consistent state or local laws are not displaced. This clause obviates the need to look further to determine whether Congress has occupied the field—clearly it has not.

■ The difficult inquiry is whether DPUC enforcement of the Line Extension Regulation and the two Orders challenged in this case is so inconsistent with the Act as to be preempted by it. If an express provision of the Cable Act prohibits regulation of the sort being challenged in this case, *Jones v. Rath Packing Co.,* or if DPUC enforcement of the Regulation and Orders would frustrate the effectiveness of the Cable Act, *Perez v. Campbell,* 402 U.S. 637, 652, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971), the DPUC measures are invalid. Conversely, if they are not expressly prohibited and can coexist with the Cable Act, they remain in effect despite the federal statute. *See Pacific Gas & Electric Co.,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983).

■ The Cable Act establishes both substantive and procedural standards for the regulation of cable systems. It specifies the areas in which states and franchising authorities may and may not exercise regulatory authority over cable systems, and also dictates the methods by which they may exercise that authority. To withstand this preemption challenge, the DPUC Regulation and Orders must be both substan-

tively and procedurally consistent with the Cable Act.[5]

### 1. *Substantive preemption*

HCV has challenged two substantive aspects of the DPUC's actions: the attempt to dictate line extension policy and the attempt to bar contributions in aid of construction.

■ The issue of the DPUC's power to regulate line extensions arises under section 544(a) which states that a franchising authority "may not regulate the services, facilities, and equipment provided by a cable operator except to the extent consistent with this subchapter." 47 U.S.C. § 544(a). The substantive issue is easily resolved. Line extension is not a subject that the Cable Act removes from the jurisdiction of the state as franchising authority. Section 544(b) provides that:

> In the case of any franchise granted after the effective date of this subchapter, the franchising authority, to the extent related to the establishment or operation of a cable system—(1) in its request for proposals for a franchise (including requests for renewal proposals, subject to section 546 of this title), may establish requirements for facilities and equipment ...; and (2) subject to section 545 of this title, may enforce any requirements contained within the franchise—(A) for facilities and equipment....

47 U.S.C. § 544(b). Section 544(c) provides that for "any franchise in effect on the effective date of this subchapter, the franchising authority may, subject to section 545 ..., enforce requirements contained within the franchise for the provision of services, facilities, and equipment...." 42 U.S.C. § 544(c). Finally, section 552(a) allows a franchising authority to require as part of a franchise, "provisions for enforcement of ... construction schedules and other construction-related requirements of the cable operator." 47 U.S.C. § 552(a). These provisions make it clear that Congress did not take away the power of the state as franchising authority to require that a cable operator construct a given portion of its franchise area on a specified schedule.

This conclusion is bolstered by the legislative history of the Cable Act, which indicates that Congress viewed line extension as a particularly appropriate subject for the exercise of local control. The House Report accompanying the Cable Act states that:

> matters subject to state and local authority include, to the extent not addressed in the legislation, certain terms and conditions related to ... the construction and operation of the system (e.g., extension of service, safety standards, timetable for construction) and the enforcement and administration of a franchise....

1984 U.S.Code Cong. & Ad.News at 4696. In explaining the rationale for permitting franchising authorities to set requirements concerning facilities, the House Report notes that "[t]he ability of a local government entity to require particular cable facilities and to enforce requirements in the franchise to provide those facilities is essential if cable systems are to be tailored to the needs of each community." *Id.* at 4663.

■ The issue of the DPUC's substantive power to prohibit HCV from collecting contributions in aid of construction from residents of sparse areas is less straightforward. HCV characterizes contributions in aid as "rates" and claims that any at-

---

**5.** In assessing the continuing validity of the DPUC's Regulation and Orders, it is important to note that the DPUC has two roles under the Cable Act. As an agency of the State of Connecticut, the DPUC comes within the Cable Act's definition of "State," 47 U.S.C. § 522(15), and is subject to those sections of the Act that deal with the scope of state regulatory power. The DPUC is also a "franchising authority" as de-fined in the Cable Act, 47 U.S.C. § 522(9), and as such is subject to those provisions that define and limit the ability of franchising authorities to impose and enforce obligations on cable operators. Because of this dual role, the DPUC may have the power to enforce the Regulation and Orders as a franchising authority even if they are no longer valid as a means of state regulation.

tempt by the DPUC to regulate them is preempted under section 543(a), whereby:

> [a]ny Federal agency or State may not regulate the rates for the provision of cable service except to the extent provided under this section. Any franchising authority may regulate the rates for the provision of cable service, or any other communications service provided over a cable system to cable subscribers, but only to the extent provided under this section.

47 U.S.C. § 543(a). HCV's argument has two flaws, however. First, it is not clear that contributions in aid are rates for the provision of cable service; and second, even if they are rates, other provisions of the Cable Act expressly authorize the DPUC to involve itself in the kinds of decisions at issue here.

The Cable Act does not define "rates for the provision of cable service," or even "rates"; therefore, the court must look to other indicia to determine what Congress intended that term to embrace. An examination of the Cable Act as a whole convinces me that the contributions in aid of construction at issue in this case are not rates for the provision of cable service within the meaning of the Act, and that the Cable Act does not preempt franchising authorities from making decisions concerning such contributions.

It is a strong indication of the untenability of HCV's position that its characterization of contributions in aid of construction as rates for the provision of cable service would defeat its own claim in this case. Section 543 of the Cable Act, entitled "Regulation of Rates," contains several subsections. Subsection (a) is a limited prohibition on rate regulation. 47 U.S.C. § 543(a). Subsections (e) and (f), however, specifically empower states and franchising authorities to prohibit "discrimination among customers of basic cable service" notwithstanding any other provisions of the Cable Act. 47 U.S.C. § 543(e) & (f). If contributions in aid are "rates," the result of permitting HCV to assess them to residents of sparse areas would be that cus-

tomers of basic cable service would be required to pay different rates for that service based upon where they live. Both the State of Connecticut and the DPUC as franchising authority have the power to forbid such a practice. 47 U.S.C. § 543(e) & (f). The fact that interpreting these contributions as rates brings them within the scope of an express exception to the prohibition of rate regulation is a strong indication that Congress did not intend to preempt regulation of such costs.

In addition, the Cable Act requires franchising authorities to assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the area in which they reside:

> In awarding a franchise or franchises, a franchising authority shall assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides.

47 U.S.C. § 541(a)(3). Denying franchising authorities the power to prohibit contributions in aid would seem to be in direct conflict with this express provision of the Act. The court must be reluctant to interpret an ambiguous provision of a statute in a way that would defeat express provisions of the same statute.

These considerations convince me that the Cable Act does not preempt the substantive power of the DPUC to prohibit HCV from charging contributions in aid of construction to residents of sparse areas, and that such contributions are not rates for the provision of cable service within the meaning of the Cable Act.

### 2. *Procedural preemption*

Although the subject matter that the DPUC has attempted to regulate is not preempted by the Cable Act, the question remains whether the manner in which the DPUC has exercised its authority is inconsistent with the procedural restrictions of the Act.

Section 541(c) of the Cable Act expressly abolishes the power of states to regulate cable systems as public utilities. 47 U.S.C. § 541(c). Thus, the Act has displaced the system under which the DPUC as a state regulatory agency traditionally has regulated cable systems in Connecticut. Once the Cable Act became effective, the DPUC lost the power to impose new obligations upon cable operators in the middle of a franchise term by adopting regulations and issuing orders, even on matters legitimately within its power to control as a franchising authority.

Instead, the Cable Act establishes procedural standards that limit the ability of a franchising authority to establish or alter the terms of its agreement with a cable operator to the franchising process. For example, as mentioned above, for franchises or renewals granted after the effective date of the Cable Act, a franchising authority may establish requirements for facilities and equipment in its requests for proposals for a franchise or requests for renewal proposals, and may enforce any such requirements that are contained within a franchise. 47 U.S.C. § 544(b). Likewise, a franchising authority may require provisions for the enforcement of construction schedules and other construction-related requirements as part of a franchise or franchise renewal. 47 U.S.C. § 552(a).

In passing the Cable Act, however, Congress did not simply displace all existing regulatory arrangements between cable operators and franchising authorities. Instead, it created a transition mechanism within the Cable Act by providing for the continuing effectiveness of existing franchise provisions and state laws. Under section 557(a), for instance:

> The provisions of ... any franchise in effect on the effective date of this subchapter ... shall remain in effect, subject to the express provisions of this subchapter, and for not longer than the then

current remaining term of the franchise as such franchise existed on such effective date.

47 U.S.C. § 557(a). More specifically in relation to line extension requirements, under section 544(c):

> In the case of any franchise in effect on the effective date of this subchapter, the franchising authority may, subject to section 545 of this title [modification of franchise obligations] enforce requirements contained within the franchise for the provision of services, facilities, and equipment....

47 U.S.C. § 544(c).

The HCV franchise, granted more than eight years prior to the effective date of the Cable Act is an "existing franchise" within the meaning of the Cable Act. 47 U.S.C. § 557(b). The Line Extension Regulation, as amended in 1980, and the 1982 Line Extension Order were issued and applicable to HCV well before the Cable Act became effective.

 HCV has stated that the issue in this case is "when and to what degree the State of Connecticut may impose regulatory conditions upon cable franchises." Plaintiff's Memorandum in Support of Motion for Preliminary Injunction at 19. That characterization is not quite accurate. The real question is when and to what degree the State of Connecticut as franchising authority may continue to enforce regulatory conditions previously imposed upon cable franchises. Resolution of this question depends on whether the Regulation and the Line Extension Order were grandfathered by section 557(a) as provisions of a franchise, or by section 544(c) as requirements "contained within the franchise." If they remain enforceable despite the Cable Act, the 1985 Order is valid as a means of enforcing those pre-existing obligations.[6]

---

**6.** The 1985 Order occupies a somewhat different position than the Line Extension Regulation and Line Extension Order because it was not issued until after the Cable Act became effective. The 1985 Order was issued as part of the DPUC's enforcement of its Regulation and its earlier Order. If the DPUC retains authority to enforce those pre-Act measures, the 1985 Order is not preempted.

The Cable Act defines "franchise" to mean:

an initial authorization, or renewal thereof (including a renewal of an authorization which has been granted subject to section 546 of this title), issued by a franchising authority, whether such authorization is designated as a franchise, permit, license, resolution, contract, certificate, agreement, or otherwise, which authorizes the construction or operation of a cable system.

47 U.S.C. § 522(8). The certificate of Public Convenience and Necessity issued by the DPUC to HCV falls squarely within this definition. HCV claims, however, that any obligations imposed upon it subsequent to that initial authorization are not within the definition of "franchise" and are not grandfathered by the Cable Act. In so arguing, HCV essentially takes the position that in determining what is preserved by the Cable Act, the relationship between a cable operator and the DPUC must be rolled back to the date of the original franchise grant and any intervening adjustments disregarded. The structure and purpose of the Cable Act and its legislative history all indicate that the grandfather provisions cannot be given such a narrow construction.

The definition of "franchise" contained in the Cable Act is very broad by its terms. Inclusion of the catchall phrase "or otherwise" indicates an intent that the word "franchise" not be restrictive, but rather be broad enough to encompass the wide variety of methods whereby localities regulated cable systems prior to the Cable Act.

The legislative history of the Cable Act elaborates on the definition of "franchise," stating that it "includes any amendments, modifications, or collateral agreements directly ancillary to such authorization." H.R.Rep. No. 98–934, 98th Cong., 2d Sess. 3, *reprinted in* 1984 U.S.Code Cong. &

Ad.News at 4681–82. This statement belies HCV's contention that Congress intended to turn back the clock to the date a franchise was granted in determining the stage at which the relationship between the parties should be frozen for purposes of the Cable Act.

The breadth of the Cable Act's definition of franchise, coupled with the legislative history, permits the interpretation that the relationship of the parties as it stood at the time the Act became effective represents the franchise for purposes of the grandfather provisions.

Although HCV now complains that the DPUC is imposing obligations upon it that were not part of the original bargain between the parties, HCV took its franchise subject to state law and the power of the DPUC to pass subsequent regulations. Conn.Gen.Stat. § 16–333. That understanding was a part of the bargain between the parties and governed their relationship until passage of the Cable Act. HCV has not claimed that the DPUC's Line Extension Regulation and Line Extension Order were invalid methods for imposing obligations on it prior to the Cable Act. Until that change in the law, HCV's objections went only to the substantive fairness of the economic burden these obligations imposed upon it.[7] The validly-enacted Regulation and Line Extension Order, issued before passage of the Cable Act, effectively altered the initial authorization granted to HCV in a manner contemplated by the franchise agreement and were part of the HCV franchise when the Cable Act became effective. *American Television & Communications Corp. v. City of Montevideo*, 603 F.Supp. 1376, 1378 & n. 2 (D.Minn. 1985) (assuming that it was validly enacted, City Resolution passed 12 days prior to effective date of Cable Act "became a part of the City Franchise authorizing the operation of [the] cable system"). As such,

---

**7.** In its reply memorandum, HCV tacitly acknowledges this point. In responding to the defendants' statement that HCV had not challenged the 1980 Line Extension Regulation, HCV states: "The Cable Act, however, did not become effective until December 29, 1984. It is,

therefore, not difficult to determine why this challenge was not made earlier." Plaintiff's Reply Memorandum at 17 n. 7. Evidently, HCV does not claim that the DPUC lacked the authority to impose this obligation in this manner prior to the Cable Act.

they remain enforceable to the extent that they are not substantively inconsistent with the Act.

This conclusion is strengthened by the fact that the restrictive reading of the grandfather provisions urged by HCV would undermine the purposes and structure of the Cable Act. Although each party claims that its interpretation promotes the goals of the Cable Act, I find that denying the injunction in this case best furthers and reconciles these purposes. The stated purposes of the Act are to:

> (1) establish a national policy concerning cable communications;
>
> (2) establish franchise procedures and standards which encourage the growth and development of cable systems and which assure that cable systems are responsive to the needs and interests of the local community;
>
> (3) establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems;
>
> (4) assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public;
>
> (5) establish an orderly process for franchise renewal which protects cable operators against unfair denials of renewal where the operator's past performance and proposal for further performance meet the standards established by this subchapter; and
>
> (6) promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems.

47 U.S.C. § 521.

Congress' intent to maximize the availability and diversity of cable service is evident throughout the Cable Act, both in its stated purposes and in the strong provisions that it contains promoting broad access to cable television. The sections of the Act empowering states and franchising authorities to prohibit discrimination among customers of basic cable service, 47 U.S.C. § 543(f), and to assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the area in which they reside, 47 U.S.C. § 541(a)(3), which have already been discussed, illustrate the emphasis on encouraging equal access to cable television.

Congressional concern with maximizing the availability of cable services also pervades the legislative history of the Cable Act. In summarizing the purpose of the Act, the House Report recognizes the relationship between cable television and the first amendment:

> The legislation also contains provisions to assure that cable systems provide the widest possible diversity of information services and sources to the public, consistent with the First Amendment's goal of a robust marketplace of ideas—an environment of "many tongues speaking many voices." Cable television offers the public an abundance of channels, with the potential to present a wide variety of perspectives from many different types of program providers.

1984 U.S.Code Cong. & Ad.News at 4656. Wide consumer access to cable service was seen as especially important in view of that link. For instance, the House Report states:

> As we enter the "information age," access to telecommunications networks has become increasingly important to full participation in the political, economic, social, and cultural life of the nation. The First Amendment's guarantee of a free flow of diverse ideas will be reduced to an empty promise if access to information is not available to all of our citizens.
>
> Consumer access to cable is integral to the diversity provisions of H.R. 4103. There is simply no point in requiring diverse information sources and services if a large segment of the population ... can be denied access to that information by a landlord who, in effect, functions as an editor for his or her tenants.

H.R.Rep. No. 98–934, *reprinted in* 1984 U.S.Code Cong. & Ad.News at 4673.[8]

The intent to displace state and local regulation, on the other hand, is by no means as clear as HCV contends. Rather than simply preempting all existing regulation, as it could have done, Congress chose to create a finely-tuned system coordinating federal, state, and local authority and also to preserve those provisions of existing franchises that were not inconsistent with the Cable Act. To enjoin the DPUC's existing Line Extension Regulation and pre-Act Order would be to ignore this structure.

The interpretation urged by HCV rests on the assumption that Congress intended to invalidate any existing franchising arrangements that were not imposed in a manner conforming to the procedural standards of the Cable Act, even though they were made at a time when those standards did not exist. Such an interpretation would give the Cable Act a severely retroactive effect, invalidating arrangements that were made years before the federal statute came into existence, and that were valid when made. That result is particularly inappropriate in view of the clear intent of Congress, expressed in the Act and its legislative history, not to displace all past arrangements or to occupy the field.

The House Report elaborates on the role of states under the Act:

A state may not, with regard to [a requirement that must be reflected in a franchise] ... enact a statute which requires compliance prior to the expiration of the current franchise. For example, it *[sic] after the effective date of this Act,* a state enacts a statute requiring a new PEG channel, that provision may only be phased in as each franchise comes up for renewal.

Nothing in Title VI is intended to overturn state law or regulations in effect on the effective date of H.R. 4103 ..., as

long as such regulations or laws are consistent with the title.

H.R.Rep. 98–934, *reprinted in* 1984 U.S. Code Cong. & Ad.News at 4731 (emphasis added). This explanation evidences the legislative intent not to impose the procedural standards of the Cable Act retroactively on prior-enacted state laws.

Finally, enjoining the Regulation and Orders would create an anomalous situation in which, although the DPUC was validly regulating HCV's line extension obligations for several years prior to the Cable Act, and can impose the same requirements when the franchise comes up for renewal, HCV would be free of any obligations regarding extension of service during the interval between advent of the Cable Act and franchise renewal. In light of the Congressional concern with promoting broad access to cable services that is so evident in the Cable Act and its legislative history, an interpretation permitting such a result would itself be inconsistent with the Act. *See Pacific Gas & Electric Co.*, 461 U.S. at 207–08, 103 S.Ct. at 1724 (noting the unlikelihood that Congress would have left a regulatory vacuum as grounds for assuming that Congress left certain regulatory judgments to the states).

Although the decision that the Cable Act does not preempt the Line Extension Regulation and the two challenged DPUC Orders leaves HCV subject to their requirements, the company is not without remedy. Under section 544(c) of the Cable Act, the power of a franchising authority to enforce requirements contained within the franchise for the provision of services, facilities, and equipment is subject to section 545, "Modification of franchise obligations." The House Report indicates that Congress foresaw that situations such as the present one would arise and intended

---

**8.** This portion of the House Report refers specifically to the importance of making cable service available to apartment dwellers. Although a provision of H.R. 4103 that would have required building owners to permit the wiring of their premises by cable operators was not included in the final version of the Cable Act, this excerpt from the legislative history is nonetheless relevant to the broader issue of Congressional concern with access to cable services for consumers in general.

that they should be resolved through the modification mechanism. It states:

> The ability of a local government entity to require particular cable facilities ... is essential if cable systems are to be tailored to the needs of each community and [the Act] explicitly grants this power to the franchising authority.

The legislation grandfathers all existing franchise provisions not inconsistent with the express provisions of the Act. However, it also recognizes that circumstances may warrant modification, so it establishes procedures and standards for modifying franchise terms.

1984 U.S.Code Cong. & Ad.News at 4731.

The modification process delineated in section 545 [9] entitles a cable operator to seek modification of its franchise obligations in a public proceeding to be held by the franchising authority within 120 days of receipt of a request. If the request for modification is denied by a final decision of the franchising authority, the cable operator may seek modification in judicial proceedings.[10] If compliance with the Line Extension Regulation and the Orders is commercially impracticable for HCV, it can pursue its complaint through this route as dictated by Congress in the Cable Act.

## CONCLUSION

Based upon the foregoing analysis, I conclude that the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521 *et seq.*, does not preempt the DPUC from enforcing its Line Extension Regulation, its Line Extension Order, or its 1985 Order against HCV. The obligations imposed by these measures are not substantively inconsistent with the Cable Act. As the Line Extension Regulation and Line Extension Order were validly imposed upon HCV prior to the effective date of the Cable Act and were a part of the HCV franchise at the time the Act became effective, DPUC en-

---

**9.** § 545. Modification of franchise obligations
 (a) Grounds for modification by franchising authority; public proceeding; time of decision
 (1) During the period a franchise is in effect, the cable operator may obtain from the franchising authority modifications of the requirements in such franchise—
 (A) in the case of any such requirement for facilities or equipment ... if the cable operator demonstrates that (i) it is commercially impracticable for the operator to comply with such requirement, and (ii) the proposal by the cable operator for modification of such requirement is appropriate because of commercial impracticability....
 (2) Any final decision by a franchising authority under this subsection shall be made in a public proceeding. Such decision shall be made within 120 days after receipt of such request by the franchising authority, unless such 120 day period is extended by mutual agreement of the cable operator and the franchising authority.
 (b) Judicial proceedings; grounds for modification by court
 (1) Any cable operator whose request for modification under subsection (a) of this section has been denied by a final decision of a franchising authority may obtain modification of such franchise requirements pursuant to the provisions of section 555 of this title.
 (2) In the case of any proposed modification of a requirement for facilities or equipment, the court shall grant such modification only if the cable operator demonstrates to the court that—
 (A) it is commercially impracticable for the operator to comply with such requirement; and
 (B) the terms of the modification requested are appropriate because of commercial impracticability.
 ....
 (f) "Commercially impracticable" defined
 For purposes of this section, the term "commercially impracticable" means, with respect to any requirement applicable to a cable operator, that it is commercially impracticable for the operator to comply with such requirement as a result of a change in conditions which is beyond the control of the operator and the nonoccurrence of which was a basic assumption on which the requirement was based.

**10.** § 555. Judicial proceedings
 (a) Any cable operator adversely affected by any final determination made by a franchising authority under section 545 or 546 of this title may commence an action within 120 days after receiving notice of such determination, which may be brought in—
 (1) the district court of the United States for any judicial district in which the cable system is located; or
 (2) in any State court of general jurisdiction having jurisdiction over the parties.
 (b) The court may award any appropriate relief consistent with the provision of the relevant section described in subsection (a) of this section.

forcement of these measures is not procedurally inconsistent with the Act. The 1985 Order is part of that enforcement.

For the foregoing reasons the plaintiff's request for declaratory and injunctive relief is hereby denied.

SO ORDERED.