WALTER J. KUNICKI, Chairperson Assembly Organization Committee
You have asked my opinion whether the provisions of 1991 Assembly Bill 6 would be preempted by federal law if enacted. You have also asked me to evaluate a subsequently drafted Assembly Substitute Amendment.
According to the Legislative Reference Bureau (LRB) analysis, the purpose of the bill is to allow the use of splitting devices on cable television service in one's dwelling, and to prohibit the cable television company from charging any additional fee because a person installs or uses a splitting device. The substitute amendment requires municipalities to impose these same provisions as part of any cable franchise grant, renewal or modification under section 66.082 (3m), Stats. The question is whether these provisions are preempted by the federal Cable Communications Policy Act of 1984, 47 U.S.C.A. § 521 (West 1991), et seq. (the Cable Act).
 The basic principles of federal preemption of state law are well-settled. Under the Supremacy Clause of the Constitution, the law of the United States is "the supreme Law of the Land . . ., any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, where state laws come into conflict with federal law, the state enactments cannot stand.
 The Supreme Court has developed a two-step inquiry for determining when a federal law preempts state law. The first inquiry is whether Congress has prohibited state regulation of the area in question entirely. Congress can accomplish a total displacement of state law either by *Page 249 
stating its intent to preempt an entire area expressly in the language of the statute, or by exhibiting an intent to occupy the field implicitly through the structure and purpose of a federal statute.
 Even if Congress has not completely ousted state regulation in a field, federal law preempts state law that conflicts with it. Accordingly, the second inquiry is to determine whether challenged state provisions conflict with federal law. For preemption purposes, a state law is said to conflict with a federal law when, under the circumstances of the particular case, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Jones v. Rath Packing Co., 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604
(1977); Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).
 In the Cable Act, Congress recognized the need for regulation on the federal, state, and local levels. 47 U.S.C. § 521
(3); H.R. Rep. No. 98-934, 98th Cong., 2d Sess. 3, reprinted in 1984 U.S. Code Cong. Ad. News 4655, 4656. To accomplish the coordination of these various levels of authority, Congress included express preemption provisions in the Act. These provisions do not prohibit state and local regulation completely.
. . . .
 . . . If an express provision of the Cable Act prohibits regulation of the sort being challenged in this case or if . . . enforcement of the Regulation and Orders would frustrate the effectiveness of the Cable Act, the . . . measures are invalid. Conversely, if they are not expressly prohibited and can coexist with the Cable Act, they remain in effect despite the federal statute.
Housatonic Cable Vision v. Dept. of Public Utility, 622 F. Supp. 798,805-06 (D.C. Conn. 1985) (citations omitted). *Page 250 
The pertinent parts of 47 U.S.C.A. § 543 (West 1991), entitled Regulation of rates, and 47 U.S.C.A. § 544 (West 1991), entitled Regulation of services, facilities, and equipment, read as follows:
§ 543. Regulation of rates
 (a) Limitation on regulatory power of Federal agencies, States, or franchising authorities
 Any Federal agency or State may not regulate the rates for the provision of cable service except to the extent provided under this section. Any franchising authority may regulate the rates for the provision of cable service, or any other communications service provided over a cable system to cable subscribers, but only to the extent provided under this section.
 (b) Promulgation of regulations; scope; contents; periodic review and amendment
 (1) Within 180 days after October 30, 1984, the Commission shall prescribe and make effective regulations which authorize a franchising authority to regulate rates for the provision of basic cable service in circumstances in which a cable system is not subject to effective competition. Such regulations may apply to any franchise granted after the effective date of such regulations. Such regulations shall not apply to any rate while such rate is subject to the provisions of subsection (c) of this section.
 (2) For purposes of rate regulation under this subsection, such regulations shall —
 (A) define the circumstances in which a cable system is not subject to effective competition; and
(B) establish standards for such rate regulation.
§ 544. Regulation of services, facilities, and equipment
(a) Regulation by franchising authority *Page 251 
 Any franchising authority may not regulate the services, facilities, and equipment provided by a cable operator except to the extent consistent with this subchapter.
 (b) Requests for proposals; establishment and enforcement of requirements
 In the case of any franchise granted after the effective date of this subchapter, the franchising authority, to the extent related to the establishment or operation of a cable system —
 (1) in its request for proposals for a franchise (including requests for renewal proposals, subject to section 546 of this title), may establish requirements for facilities and equipment, but may not establish requirements for video programming or other information services; and
 (2) subject to section 545 of this title, may enforce any requirements contained within the franchise —
(A) for facilities and equipment; and
 (B) for broad categories of video programming or other services.
The first sentence in 47 U.S.C.A. § 543 (a) constitutes express federal preemption of state regulation of rates for the provision of cable service. Some specific authority is reserved to states in section 543 (f) and (g), but they are not pertinent here.
Pursuant to 47 U.S.C.A. § 543 and 47 C.F.R. § 76.33 (1991) adopted thereunder, a franchising authority, which in our state would be a municipality under section 66.082, may regulate the rates of a cable system only for basic cable service and only if the cable system is not subject to effective competition. Pursuant to 47 U.S.C.A. § 544, a franchising authority may establish and enforce requirements "for facilities and equipment" as part of the franchising process, and in particular by way of its requests for proposals for a franchise. *Page 252 
The question becomes whether the prohibition against charging for a splitter constitutes regulation of "rates for the provision of cable service" so as to be preempted.
In the Housatonic case, the question was whether the state could prohibit a cable company from collecting special "contributions in aid of construction" from persons in sparsely populated areas into which cable service was being extended. The court noted that the Cable Act does not define the term "`rates'" or phrase "`rates for the provision of cable service'" and went on to hold that special contributions in aid of construction were not covered and thus not preempted. Housatonic,622 F. Supp. at 808.
In the very recent case of Cable Television Ass'n v. Finneran,954 F.2d 91 (2nd Cir. 1992), the question before the United States Court of Appeals for the Second Circuit was whether the State of New York could regulate rates charged by cable television companies to customers who downgrade to a less expensive level of cable service. The plaintiff claimed such regulation is preempted by section 543 of the Cable Act. The district court and the court of appeals both focused on the phrase "provision of" in the language preempting regulation of "rates for the provision of cable services." The court held that this terminology in the statute must be given effect and in so doing the court held that rates relating to downgrades in service do not relate to the "provision of" cable services.954 F.2d at 98-99. Also, see Comcast Cablevision v. Sterling Heights,178 Mich. App. 117, 443 N.W.2d 440 (Mich.App. 1989), where the court held that a prohibition against "disconnect fees" did not constitute regulation of rates for the provision of cable service.
Addressing the plaintiff's argument that the phrase "provision of" should be construed more broadly, the court stated: "This argument misses the fact that Congress' purpose in section 543 was not to curtail regulation in the abstract but rather to do so in order to allow market forces to control the rates charged by *Page 253 
cable companies. . . . Downgrade charges, however, insulate cable companies from market forces." 954 F.2d at 100.
The question posed by your request is whether the prohibition against a splitter fee involves the "provision of cable service" within the meaning of the act. It is my opinion it does not. As used here the term "provision" is synonymous with "supply." Cable service is supplied by bringing a functioning cable into the user's dwelling and connecting it to the user's equipment. SeeCable Television Ass'n, 954 F.2d at 92-93. Thereafter, there is no question that a user could disconnect the cable from one piece of equipment and reconnect it to another. The user could use the cable supply in various ways, including the use of a splitter to multiply the number of connected pieces of equipment within the dwelling. The "provision of cable service" remains the same; it is merely the use of the service that is affected. Thus, to paraphrase the court in Comcast, a splitter fee has nothing to do with the provision of cable service, but instead is a fee imposed upon use of a particular service. Such regulation is not preempted. Comcast, 443 N.W.2d at 442-43.
With reference to the underlying commitment to reliance on market forces, it seems clear that the prohibition against splitter fees is promotive of competition and the artificial splitter fee is not. With the prohibition in place, the cable service user is free to benefit from a free market for splitter devices. Presumably a user may choose to purchase the splitter from the cable company or some other source based on the user's assessment of all the factors that would go into such a consumer decision. In the absence of the prohibition, the user is charged a splitter fee by the company even where he would choose to purchase the splitter from another source. This discourages resort to the market for other choices, just as the "downgrade charge" in Cable Television Ass'n discouraged a user from downgrading. 954 F.2d at 99-100. *Page 254 
In fact, the anticompetitive characteristics of cable companies' policies on this subject are such that some may constitute illegal tying arrangements under the antitrust laws.
 [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.
Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12
(1984). When a "seller exploits his dominant position in one market to expand his empire into the next," a tying arrangement exists. Times-Picayune Pub. Co. v. United States, 345 U.S. 594,611 (1953). Tying is a per se violation of the antitrust law; that is, because they pose an unacceptable risk of stifling competition, they are "unreasonable `per se.'" Jefferson Parish,466 U.S. at 9.
On a broader level, the Cable Television Ass'n case contains a recent recognition of the fact that the Cable Act constitutes more an allocation of power than a preemption of power.
 In short, in the Cable Act Congress attempted to create a comprehensive and reticulated scheme for regulating cable television and to define the relative spheres of authority of the states and the federal government. The Act cut back on federal authority in some places — particularly control of franchising. The Act removed state authority in others — like regulation of rates for the provision of basic service. The question for this appeal is where downgrade charges fit in this tightly defined structure.
Cable Television Ass'n, 954 F.2d at 98.
Statutory sections and items of legislative history support the proposition that the state retains its right to protect the public welfare and the premise that the Cable Act was intended to promote increased use of cable services through competition. *Page 255 
In 47 U.S.C.A. § 556 (a) (West 1991) it is stated: "Nothing in this subchapter shall be construed to affect any authority of any State, political subdivision, or agency thereof, or franchising authority, regarding matters of public health, safety, and welfare, to the extent consistent with the express provisions of this subchapter."
It is a stated purpose in 47 U.S.C.A. § 521 (4) (West 1991) to "assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public."
According to H.R. Rep. No. 934, 98th Cong., 2d Sess. 19,reprinted in 1984 U.S. Code Cong. Admin. News 4656, "The bill establishes franchise procedures and standards to encourage the growth and development of cable systems, and assure that cablesystems are responsive to the needs and interests of the localcommunities they serve." (Emphasis supplied).
In 47 U.S.C.A. § 532 (West 1991), the Cable Act requires the cable operator to provide cable channels for commercial use by persons unaffiliated, and in competition, with the operator. If the operator can regulate the number of outlets available to a subscriber, it can affect the availability of a competitor's commercial channels to the subscriber if there is only one TV outlet in the household. In H.R. Rep. No. 934 at 31, reprinted in
1984 U.S. Code Cong. Admin. News 4668, the legislative history on the section states: "Such a requirement is fundamental to the goal of providing subscribers with the diversity of information sources intended by the First Amendment."
In commenting on 47 U.S.C.A. § 553 (West 1991), which deals with pirating cable service, H.R. Rep. No. 934 at 84, reprinted in 1984 U.S. Code Cong. Admin. News 4721, states: "[T]he Committee does not intend that this section be used as a bar to the development of competition for equipment used in the reception of services by subscribers of a cable system, to the extent use of customer premises cable equipment *Page 256 
other than that supplied by the cable operator is otherwise permissible under applicable law."
In other words, the legislative history and statutory provisions surrounding the rate regulation aspects of47 U.S.C.A. § 543 evince a congressional policy which (a) validates state public welfare concerns, (b) supports maximum public access to all forms of cable programming and (c) recognizes competition as an important means of meeting the stated goals associated with cable operations.
Aside from issues involving cable piracy (47 U.S.C.A. § 553), the Cable Act expresses no interest in regulating what happens after the signal is delivered to the customer. Given the extensive provisions of 47 U.S.C.A. § 553, and the lengthy legislative history of the Cable Act, if congress had a regulatory concern about signal splitting it would have said so.
In Shenango Cable TV, Inc. v. Tandy Corp., 631 F. Supp. 835
(W.D. Pa. 1986), the court granted summary judgment to Tandy on the issue that a converter it sold did not violate47 U.S.C.A. § 553, which prohibits pirating cable signals. While admitting that its converter did permit the unauthorized reception of some non-basic channels, Tandy stated that the purpose of the converter was to permit the cable owner to use his original remote control and permit the taping of a program on a VCR while watching another channel on the TV. The court examined the legislative history of 47 U.S.C.A. § 553 and found that the converter violated the law only if it was sold with the "intention" of pirating signals. H.R. Rep. No. 934 at 83-84,reprinted in 1984 U.S. Code Cong. Admin. News 4720-21.
The Shenango ruling is significant for two reasons. First, it held that legal concern for the cable operator's signal ends when it is delivered to the cable customer, unless the converter was intended to pirate the cable signal, Shenango, 631 F. Supp. at 838. Second, as discussed by the court, 631 F. Supp. at 837, the converter, when attached to a VCR, acted as a signal splitter *Page 257 and provided two different signals, one to the tape deck and one tothe TV screen. The authorities referred to above indicate that congress' concern about the cable operator's signal ends at the point of entry, unless intention to pirate is proven.
For all these reasons, it is my opinion that state prohibition of a mandatory splitter fee is consistent with and not preempted by the federal Cable Communications Policy Act.
JED:RWL *Page 258