COMCAST CABLEVISION OF STERLING HEIGHTS, INC v CITY
OF STERLING HEIGHTS

Docket No. 106847. Submitted April 13, 1989, at Detroit. Decided July
5, 1989. Leave to appeal applied for.

Comcast Cablevision of Sterling Heights, Inc., provided cable
television service to the City of Sterling Heights pursuant to a
franchise agreement which was part of a December, 1981,
consent judgment resulting from litigation over the award of
the franchise. In December, 1984, the federal Cable Communi-
cations Policy Act of 1984 became effective. Section 543 of the
act provided for the deregulation of rates for the provision of
cable service but retained limited municipal jurisdiction for an
interim two-year period subject to a cable operator's right to
automatically increase basic rates by up to five percent per
year during this interim period. In May, 1985, Comcast in-
creased its basic rate by five percent. On December 5, 1985, it
announced a further five percent increase, which went into
effect January 15, 1986. In addition, on June 1, 1985, Comcast
began charging its subscribers a $5 fee to disconnect a pre-
mium service. The fee was later increased to $10, effective
January 15, 1986. On February 11, 1986, the city filed an ex
parte petition in Macomb Circuit Court to enforce the consent
judgment and enjoin both the January, 1986, five percent rate
increase and the $5 increase in the disconnect fee. Following
the filing of the petition, the city amended its cable ordinance,
effective May 21, 1986, to specifically prohibit a disconnect fee
for basic, tier, or pay cable service. The court, John B. Bruff, J.,
on February 8, 1988, issued an order for declaratory judgment
holding that: the January 15, 1986, five percent rate increase
by Comcast was permissible under the federal Cable Act; the
city was not preempted by the act from regulating disconnect
fees and, therefore, the $10 disconnect fee was disallowed
commencing on May 21, 1986, the effective date of the city's
cable ordinance amendment; the requirements of the franchise

REFERENCES

Am Jur 2d, Telecommunications § 185.5.
See the Index to Annotations under Cable Television and Telecom-
munications.

agreement and the city's cable ordinance that Comcast give a ninety-day notice by filing rate increases with the city before imposition of the increases are authorized by the act and are incidental to the city's authority to forbid discriminatory rate practices; the five percent basic service rate increase and $5 increase in the disconnect fee placed into effect on January 15, 1986, by Comcast were disallowed until March 8, 1986; and Comcast was to perform an accounting to determine the amount wrongfully charged and either refund that amount or credit it to its subscribers. Comcast appealed, contending that local regulation of a disconnect fee and imposition of a ninety-day advance notice of rate increases requirement are preempted by the federal Cable Act. Comcast also challenged that part of the court's order which disallows the disconnect charge as of May 21, 1986, on the basis that the record does not reflect the basis for the relief. The city cross appealed, challenging the court's statutory construction of the term "year" which resulted in the court's upholding the January, 1986, rate increase.

The Court of Appeals *held:*

1. Both the language of the Cable Act and the nature of the disconnect fee lead to the conclusion that state or local regulation of a disconnect fee was not intended to be preempted by the Cable Act. The city is not preempted from regulating the disconnect fee.

2. The portion of the circuit court's order specifically disallowing the disconnect fee must be vacated. The opinion of the court does not address the validity of the disconnect fee in relation to the ordinance prohibiting such a fee, nor does it address whether such a fee was permitted under the franchise agreement between Comcast and the city. Because the scope of the order exceeded the issues resolved by the court, that portion disallowing the fee is vacated.

3. There is no basis for holding that the ninety-day advance notice requirement for basic rate increases, which was contained in the franchise agreement, was preempted.

4. The court correctly determined that the term "year" as used in the Cable Act refers to a calendar year rather than a twelve-month period.

Affirmed, with the exception of that portion of the order disallowing the disconnect fee. That portion of the order is vacated.

1. TELECOMMUNICATIONS — CABLE TELEVISION — PREMIUM SERVICES — DISCONNECTION FEES — STATE AND LOCAL REGULATION.

The Cable Communications Policy Act of 1984 does not preempt

state and local control over regulation of fees which can be charged by a cable television provider for the disconnection of a premium service; while the act prohibits a franchising authority from regulating rates relating to the provision of premium services, a disconnect fee has nothing to do with the provision of cable service but is, rather, a fee imposed upon the cancellation of a particular service (47 USC 521 *et seq.*).

2. TELECOMMUNICATIONS — CABLE TELEVISION — CUSTOMER SERVICE — STATE AND LOCAL REGULATION.

A cable television franchisee is statutorily authorized to enforce customer service requirements and consumer protection laws; in general, customer service means the direct business relation between a cable operator and a subscriber, and customer service requirements include requirements related to interruption of service, disconnection, rebates and credits to consumers, deadlines to respond to consumer requests or complaints, the location of the cable operator's consumer service offices and the provision to customers or potential customers of information on billing or services (47 USC 552).

3. TELECOMMUNICATIONS — CABLE TELEVISION — STATE AND LOCAL REGULATION.

Nonfederal officials may regulate those matters not directly related to the operational aspects of cable communication or those related to the actual transmission of the signal (47 USC 552).

4. TELECOMMUNICATIONS — CABLE COMMUNICATIONS POLICY ACT — "YEAR".

The term "year" as used in § 543(e) of the Cable Communications Policy Act of 1984 refers to a calendar year rather than a twelve-month period (47 USC 543[e]).

*Bellanca, Beattie & De Lisle, P.C. (by James C. Zeman)*, for plaintiff.

*O'Reilly, Rancilio, Nitz, Andrews & Turnbull, P.C. (by Neil J. Lehto)*, for defendant.

Before: MACKENZIE, P.J., and HOOD and BRENNAN, JJ.

HOOD, J. Plaintiff, Comcast Cablevision of Ster-

ling Heights, Inc., appeals as of right from a February 8, 1988, order for declaratory judgment issued pursuant to an October 29, 1987, opinion of the Macomb Circuit Court deciding issues of federal preemption under the Cable Communications Policy Act of 1984, 47 USC 521 *et seq.*, and the authority of defendant, City of Sterling Heights, to regulate certain aspects of Comcast's cable TV service.

Specifically at issue are a five percent basic rate increase and a disconnect fee for premium services that Comcast sought to impose on its subscribers. We affirm the opinion of the trial court but vacate the portion of the resulting order disallowing the disconnect fee.

The franchise agreement between Comcast and Sterling Heights was part of a December, 1981, consent judgment resulting from litigation over the award of the franchise. In December, 1984, the federal Cable Act became effective. Relevant to this case is § 543 of the act, which provided for the deregulation of rates for the provision of cable service but retained limited municipal jurisdiction for an interim two-year period subject to a cable operator's right to automatically increase basic rates by up to five percent per year during this interim period.

Under the terms of the Comcast franchise agreement, the rate for basic cable service was initially fixed at $7.50 a month through April 30, 1985. In May, 1985, pursuant to § 543 of the Cable Act, Comcast increased its basic rate by five percent from $7.50 to $7.87 per month. On December 5, 1985, it announced a further five percent increase from $7.87 to $8.26 per month, which went into effect January 15, 1986.

Additionally, on June 1, 1985, Comcast began charging its subscribers a $5 fee to disconnect a

premium service. This fee was later increased to $10, effective January 15, 1986. Premium services are separate from the basic service which includes all local VHF and UHF broadcast channels plus an additional twenty-four channels of programming. Premium services are optional and are sold on a per channel basis for additional varying rates.

This action began with the city's filing on February 11, 1986, an ex parte petition to enjoin both the January, 1986, five percent rate increase and the $5 increase in the disconnect fee. While we need not set forth all the lower court proceedings for purpose of this appeal, we note they included removal to the federal district court and remand back to the Macomb Circuit Court. During this period, the city amended its cable ordinance to specifically prohibit a disconnect fee for basic, tier, or pay cable service, effective May 21, 1986.

In an opinion of October 29, 1987, the circuit court basically found that the federal Cable Act did not preempt the city's notice requirement or regulation of the disconnect fee. Following apparently unsuccessful efforts by the parties to shape an order consistent with the opinion, the court signed the order presented by the city.

Comcast now appeals contending that local regulation of a disconnect fee and imposition of a ninety-day advance notice requirement are preempted by the Cable Act. Comcast also challenges that part of the order which disallows the disconnect charge as of May 21, 1986, on the basis that the record does not reflect the basis for this relief. The city has cross appealed, challenging the court's statutory construction of the term "year" which resulted in the court upholding the January, 1986, increase.

We begin with consideration of whether the city

can regulate the disconnect fee for premium services.

The parties agree on the applicable law. They agree that the city can establish and enforce "customer service requirements" under 47 USC 552(a)(1). They also agree that under the act the city as a franchising authority may not regulate rates relating to the "provision" of premium services.

Comcast describes the fee as a rate "associated" with the provision of premium services and therefore preempted from local regulation. The city maintains that a disconnect fee does not relate to the provision of services but to their discontinuance and, therefore, cannot be a rate for the provision of services and its regulation is not preempted. The city argues that, since its regulation of the disconnect fee is not specifically preempted by the act, it has the authority to regulate the fee as a customer service requirement. The lower court found the fee was not a charge for the provision of cable service, but "a penalty imposed upon the customer for exercising the choice to disconnect a premium cable service."

Under 47 USC 543, the city may "regulate the rates for the provision of cable service," but only if those rates concern the provision of "basic cable service." Basic cable services are those provided to all subscribers. *ACLU v FCC*, 262 US App DC 244, 248 n 3; 823 F2d 1554, 1558 n 3 (DC Cir, 1987). This limited authority is consistent with longstanding FCC policy which preempts state and local regulation of special pay cable programming, including rate regulation. *Brookhaven Cable TV, Inc v Kelly*, 573 F2d 765, 768 (CA 2, 1978). Thus, there is limited authority regarding rates for the provision of basic cable services and no authority regarding rates for the provision of premium ser-

vices. Everyone agrees that the fee here concerns a premium service. The question is whether it is a "rate for the provision of" the service.

Comcast has referred us to two United States Supreme Court opinions for guidance on the preemption issue, *City of New York v FCC,* 486 US —; 108 S Ct 1637; 100 L Ed 2d 48 (1988), and *Capital Cities Cable, Inc v Crisp,* 467 US 691; 104 S Ct 2694; 81 L Ed 2d 580 (1984). However, these cases concern direct conflicts between federal and local control, a situation we do not have here. Furthermore, they deal with regulations and provisions regarding technical quality and content control and provide us with no particular assistance on the question before us.

We begin with a statutory analysis of the phrase "rates for the provision," on the assumption that its meaning will apply equally to matters involving both basic and premium services.

The first step in statutory analysis is the plain meaning of the language in question. See *ACLU, supra,* p 1568. The act does not define rate nor provision. However, there is no indication that either term has some specialized technical meaning applicable only in the cable services context. Rate appears to mean, as one would commonly expect, the amount charged the subscriber to receive the cable service. We do not believe that merely because a charge is involved for something associated with cable service the charge becomes a "rate for the provision" of cable service. Nor do we believe that "provision of cable services" encompasses anything or everything associated with those services.

In *Housatonic Cable Vision Co v Dep't of Public Utility Control,* 622 F Supp 798 (D Conn, 1985), the cable service wanted to charge customers in sparsely populated areas "contributions in aid of

construction" to help finance the wiring of the areas. The state regulating unit issued an order prohibiting the contribution. The cable service characterized the contributions as "rates" and claimed preemption under the same § 543(a) at issue here. The court disagreed, finding nothing in the act to support this characterization. *Id.,* pp 807-808.

Arguably, since the contribution was for the wiring of the area, it was associated with the "provision" of cable services to that area. Also, since it involved a charge to the customers, it could arguably be described as a rate. However, there is nothing in the plain meaning of the act or in its interpretations that indicates that such a reading is justified. Similarly, we see no justification for interpreting the section that broadly here.

Therefore, we find that both the language of the statute and the nature of the fee involved lead to the conclusion that the regulation of a disconnect fee was not intended to be preempted by the Cable Act. The Cable Act does not refer to rates or fees generally but refers only to rates for the "provision" of cable service. A disconnect fee has nothing to do with the provision of cable service, but instead is a fee imposed upon the cancellation of a particular service. The city is not preempted from regulation of this fee.

Furthermore, as noted by the city, 47 USC 552 allows the city to enforce customer service requirements and consumer protection laws. Although customer service is not defined, both parties have referred us to the following legislative history of the Cable Act, as found in HR Rep No 98-934, 98th Cong, 2d Sess, reprinted in 1984 US Code Cong & Admin News 4655, 4716, which describes customer service as follows:

> In general, customer service means the direct business relation between an [sic] cable operator and a subscriber. Customer service requirements include requirements related to interruption of service; *disconnection*; rebates and credits to consumers; deadlines to respond to consumer requests or complaints; the location of the cable operator's consumer service offices; and the provision to customers (or potential customers) of information on billing or services. [Emphasis added.]

The matters listed here are consistent with the view that nonfederal officials may regulate those matters not directly related to the operational aspects of cable communication or those related to the actual transmission of the signal. See *Capital Cities, supra,* 467 US 702-703.

The trial court here described the disconnect fee as a penalty imposed upon a consumer for exercising his or her choice to disconnect a premium service. Because the disconnect fee has no effect on the subscription rate for receiving the service and appears to be intended primarily as a deterrent measure, it would appear that the city may regulate the disconnect fee as a consumer protection measure.

However, while we agree with the trial court that the city was not preempted in this matter, we agree with Comcast that the portion of the order specifically disallowing the fee must be vacated. The opinion of the trial court does not address the validity of the disconnect fee in relation to the ordinance prohibiting such a fee, nor does it address whether such a fee was permitted under the franchise agreement. Because the scope of the order exceeded the issues resolved by the court, that portion disallowing the fee is vacated.

We affirm the trial court's finding on the other issues raised by the parties. We find no basis for

holding that the ninety-day advance notice requirement for basic rate increases, which was contained in the franchise agreement, was preempted. The Cable Act did not affect existing franchise agreements, unless they were inconsistent with the act. 47 USC 556, 557. The notice requirement is consistent with the city's ability to regulate customer service requirements, as discussed above. The requirement did not prevent Comcast from imposing the increase provided for under 47 USC 543(e), it merely regulated the procedure for imposing it. We are not convinced that anything in the act preempts the city's authority to enforce the advance notice requirement contained in the franchise agreement.

Finally, we also agree with the trial court that the term "year" as used in 47 USC 543(e) refers to a calendar year rather than a twelve-month period. Section 543(e) allows the cable operator to impose on its own discretion a five percent rate increase "per year" during the two-year period following the effective date of the act.

Pursuant to this provision, Comcast increased its rates by five percent in May, 1985, and then increased them another five percent in January, 1986. The city claims the January, 1986, rate increase was impermissible under the Cable Act because it occurred within the twelve months following the May, 1985, rate increase.

The term "year" is not defined in the act. Both parties have discussed an unpublished federal opinion on this issue, *Town of Barnstable v TCI-Taft Cablevision Assoc,* No 86-0143-MA (DC Mass, 1986). While this opinion is not controlling on this Court, we find its reasoning persuasive.

First, the court noted that the term "year" when used in a statute has generally been construed to denote a calendar year, running from January 1 to

December 31. See Anno: *What 12-month period constitutes "year" or "calendar year" as used in public enactment, contract, or other written instrument,* 5 ALR3d 584, 588; *Black's Law Dictionary* (Rev 4th ed, 1968). Furthermore, the act itself indicates that if Congress intended a twelve-month period, it knew how to so specify; § 542, dealing with franchise fees, provides for a twelve-month-period limitation. It would also appear that the calendar year interpretation would lead to the least confusion considering the number of franchise agreements and situations which could be affected nationally. In the absence of some other reference in the act requiring some other interpretation, we agree with the calendar year construction.

The opinion of the trial court is affirmed. We affirm its order in part, vacating only the portion disallowing the disconnect fee.