**WESTMARC COMMUNICATIONS, INC., et al.**

v.

**CONN. DEPT. OF PUBLIC UTILITY CONTROL, et al.**

Civ. No. H89–631(AHN).

United States District Court, D. Connecticut.

June 20, 1990.

Allan B. Taylor, Day, Berry & Howard, Hartford, CT, for plaintiffs.

Robert S. Golden, Tatiana D. Sypko, Asst. Attys. Gen., James F. Meehan, Elaine M. Leon, Valerie J. Bryan, Consumer Counsel Office, New Britain, CT, for defendants.

NEVAS, District Judge.

After review and over objection, the Recommended Ruling is approved and adopted.

So ordered.

## RECOMMENDED RULING ON PENDING MOTIONS

MARGOLIS, United States Magistrate Judge.

Plaintiffs, Westmarc Communications, Inc. and several of its subsidiaries, are owners and operators of a cable television service provider that operates in Connecticut, under the regulation of defendant Connecticut Department of Public Utility Control ("DPUC"). In their complaint, filed on September 29, 1989, plaintiffs allege that the defendants [1] have regulated plaintiffs' rates for the provision of cable television service, in violation of the Cable Communications Policy Act of 1984 ("Cable Act"), 47 U.S.C. §§ 521–59. Plaintiffs seek injunctive relief, including a declaration that the authority asserted by defendants is preempted by federal law. Defendants argue that this court should either abstain from exercising jurisdiction over this dispute, or find no preemption of defendants' authority as exercised.

On October 23, 1989, the Connecticut Office of Consumer Council ("OCC") filed a motion to intervene as a defendant (Dkt. # 8); this motion was granted by U.S. District Judge Alan H. Nevas on December 7, 1989. On December 26, 1989, defendant DPUC filed a motion to dismiss and brief in support with exhibits,[2] requesting that the

---

**1.** Also named as defendants is the Public Utility Control Authority ("PUCA"), as well as individuals who are DPUC Commissioners and PUCA members in their official capacities (collectively referred to as "the DPUC").

**2.** These exhibits were as follows: copy of Conn. Gen.Stat. § 16–47 (App. A); copy of Conn.Gen. Stat. § 16–41 (App. B); copy of Petition for

Administrative Appeal filed in the Hartford Superior Court in *Westmarc Communications, Inc. et al. v. Department of Public Utility Control et al.,* dated September 8, 1989 ("State Court Complaint") (App. C); and copy of Stipulation of the Parties for Partial Stay Pending Appeal in *Westmarc Communications, Inc. et al. v. Department of Public Utility Control et al.,* Dkt. No. 700432,

court abstain from hearing this matter. (Dkt. # 13–14). The next day, defendant OCC filed a similar motion and brief in support with exhibits.[3] (Dkt. ## 15–16). On January 16, 1990, plaintiffs filed their brief in opposition to these two motions. (Dkt. # 19).

That same day, plaintiffs also filed a motion for summary judgment, brief in support with an exhibit,[4] Local Rule 9(c) Statement, and affidavit of Dundee Nestler ("Nestler Aff't"), with respect to the pre-emption issue. (Dkt. ## 20–23). On February 28, 1990, defendant OCC filed its brief in opposition with exhibits.[5] (Dkt. # 29). That same day, defendant DPUC filed a cross-motion and brief in support with exhibits [6] on this same issue. (Dkt. ## 27–28). Plaintiffs filed a brief in opposition to this motion, and in reply to their own motion, on March 26, 1990. (Dkt. # 32).

Lengthy oral argument was held on April 23, 1990. With permission of the Court, post-argument briefs were filed by the defendants on May 2, 1990. (Dkt. ## 33–34). For the reasons stated herein,

plaintiffs' motion is granted and defendants' motions are denied.

## I. FACTUAL BACKGROUND

The parties are in agreement as to the circumstances which gave rise to this litigation. The following facts are drawn from the DPUC Decision.

The instant dispute arose out of a deal in which plaintiffs acquired Taft Cable Partners ("TCP"), adding 210,000 new subscribers in five states to its existing 343,000 subscribers in nine states.[7] (DPUC Decision at 2). TCP, operating in Connecticut under the name Haystack Cablevision ("Haystack"), served approximately 2,090 subscribers in northwestern Connecticut, and held a Certificate of Public Convenience and Necessity to provide cable television service to the towns of Salisbury, Canaan, North Canaan, Norfolk, Sharon and Cornwall. (*Id.*)

Under Conn.Gen.Stat. § 16–47,[8] changes in the control of cable franchises operating within Connecticut may only occur with the approval of defendant DPUC. Plaintiffs

---

dated October 3, 1989 ("State Court Stipulation") (App. D).

**3.** These exhibits were as follows: copy of the DPUC Decision dated August 10, 1988, in *Application of Taft Cable Partners, Westmarc Development, Inc., Westmarc Development II, Inc., and Westmarc Communications, Inc. for Approval to Become a Holding Company*, Dkt. No. 88–10–10 ("DPUC Decision") (App. A); copy of the State Complaint, with cover letter (App. B); and copy of the State Court Stipulation (App. C).

**4.** This exhibit was a copy of the DPUC Decision (Exh. 1).

**5.** These exhibits included: copy of the DPUC's *Uniform System of Accounts prescribed for Community Antenna Television (CATV) Utilities*, effective July 1, 1982; copy of Annual Report of the Haystack Cablevision, for year ending December 31, 1988; and copy of consolidated financial statements for Taft Cable Partners, for year ending December 31, 1988.

**6.** These exhibits included: copy of Conn.Gen. Stat. § 16–47 (App. A); copy of Conn.Gen.Stat. § 16–41 (App. B); and copy of the decision in *Nashoba Communications Limited Partnership No. 7 v. Town of Danvers*, 893 F.2d 435 (1st Cir.1990) (App. C).

**7.** The majority of Westmarc's stock, both voting and not, is owned by TeleCommunications, Inc. ("TCI"), which is not a party to any of the present proceedings.

TCP was sold to Westmarc by its two 50% shareholders, one of whom was a wholly owned subsidiary of TCI; the other shareholder was Northeastern Cable Limited Partnership. The apparent purpose of this transaction, from TCI's perspective, was to buy Northeastern's half share of TCP, and transfer the entire operation to the Westmarc subsidiary. Westmarc paid approximately $2,000 per subscriber for TCP's operation, for a total of over $440 million. (DPUC Decision at 2–3).

**8.** Conn.Gen.Stat. § 16–47(c) provides in pertinent part:

No corporation, association, partnership, trust or similar organization, or person shall take any action that causes it to become a holding company with control over a gas, electric, water, telephone or community antenna television company engaged in the business of supplying service within this state, or acquire, directly or indirectly, control over such a holding company, or take any action that would if successful cause it to become or to acquire control over such a holding company, without first making written application to and obtaining the approval of the department.

applied for such approval on October 25, 1988, and closed the transaction on January 3, 1989, prior to any action by defendant. (*Id.* at 2–3). Plaintiffs attempted to structure the acquisition so as to delay any transfer of control until DPUC approval was obtained. (*Id.* at 4). On August 15, 1989, defendant DPUC issued its decision, which approved the acquisition of TCP by plaintiffs, but held that closing the transaction on January 3, 1989 was an ongoing violation of Conn.Gen.Stat. § 16–47, for the 210–day period from January 3 until August 15, 1989. (*Id.* at 12–13). Under Conn. Gen.Stat. § 16–41,[9] defendants are empowered to impose fines of up to $5,000 per day for ongoing violations. Due to mitigating factors, a fine of $2,500 per day was imposed on plaintiffs, for an aggregate penalty of $525,000. (DPUC Ruling at 12–13). Defendant's decision provided that "[t]he aggregate fine, a penalty, shall not be chargeable to Connecticut subscribers." *See id.* at 12, ¶ 7.

On September 8, 1989, plaintiffs filed an appeal in the Hartford Superior Court, making multiple challenges to the validity of defendants' procedures and to the constitutionality of the penalty statute on which the DPUC relied. (State Court Complaint). Plaintiffs also raised their pending claim of federal preemption in the State court. *Id.* A Stipulation for Partial Stay Pending Appeal was filed in the Superior Court on October 3, 1989, which stayed payment of the civil penalty pending the outcome of the state court appeal. (State Court Stipulation).

## II. DISCUSSION

### A. *Motions to Dismiss*

 The DPUC's and OCC's motions ask this court to dismiss plaintiff's complaint, under the doctrine of abstention.[10] "The burden placed upon one seeking a stay or dismissal of a federal court action in favor of a state action is a heavy one." *Connecticut Fund for the Environment, Inc. v. Upjohn Co.*, 660 F.Supp. 1397, 1404 (D.Conn.1987) ("*CFE*"), *citing Landis v. North American Co.*, 299 U.S. 248, 255, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936).[11] There

---

**9.** Conn.Gen.Stat. § 16–41(a) provides in pertinent part:

> ... Any such [public service] company, any officer, agent or employee thereof, or any such person, public agency or public utility which the department finds has failed to obey or comply with any such provision of this title, order or regulation shall be fined by order of the department in accordance with the penalty prescribed for the violated provision of this title or, if no penalty is prescribed, not more than five thousand dollars for each offense ... [I]n case of a continued violation, each day thereof shall be deemed a separate offense. Each such penalty ... shall be excluded from operating expenses for purposes of rate-making.

**10.** Although styled as a motion to dismiss under Rule 12(b)(6), defendants cannot proceed on that basis for at least two reasons. First, these two motions were filed after both defendants filed answers. (*See* Dkt. ## 9 & 17). As such, they must be construed as motions for judgment on the pleadings, under Rule 12(c). And second, Rule 12(c) provides, as does rule 12(b)(6), that if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

Just recently, the Second Circuit once again criticized a district court for converting a Rule 12 motion into a Rule 56 motion, without adequate notice to the non-moving party. *Krijn v. Poque Simone Real Estate Co.*, 896 F.2d 687 (2d Cir.1990). The critical issue is "whether the non-movant 'should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.'" *Id.* at 689 (citations omitted). The two motions to dismiss were accompanied by exhibits. *See* notes 2–3 *supra.* Even assuming plaintiffs are surprised, because these two motions are being denied, there is no prejudice to plaintiffs in the Court converting the Rule 12 motions into Rule 56 motions.

**11.** A threshold procedural question concerning subject matter jurisdiction is presented by plaintiffs' preemption based request for injunctive relief. *See Public Util. Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 468–69, 63 S.Ct. 369, 376, 87 L.Ed. 396 *reh. denied,* 318 U.S. 798, 63 S.Ct. 557, 87 L.Ed. 1162 (1943). Defendant DPUC cites to *Nashoba Communications v. Town of Danvers,* 893 F.2d 435, 440–41 (1st Cir.1990), apparently for its holding that a Cable Act preemption claim does not, of itself, present a substantial federal question sufficient to establish subject matter jurisdiction in the federal court. That case expressly distinguishes its con-

is a "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483, *reh. denied*, 426 U.S. 912, 96 S.Ct. 1236, 48 L.Ed.2d 839 (1976). A federal court may abstain from adjudicating a claim only if it can thereby

(1) avoid deciding an issue of federal constitutional law by allowing a state court to resolve an issue of state law, *see Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 [61 S.Ct. 643, 85 L.Ed. 971] (1941); (2) avoid interfering with the conduct of ongoing state court proceedings, *see Younger v. Harris*, 401 U.S. 37 [91 S.Ct. 746, 27 L.Ed.2d 669] (1971); *Pennzoil Co. v. Texaco Inc.*, [481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1] (1987); or (3) avoid resolving difficult state law issues involving important public policies or avoid interfering with state efforts to maintain a coherent policy in an area of comprehensive regulation or administration, *see Burford v. Sun Oil Co.*, 319 U.S. 315 [63 S.Ct. 1098, 87 L.Ed. 1424 *reh. denied*, 320 U.S. 214, 63 S.Ct. 1442, 87 L.Ed. 1851] (1943).

*American Disposal Services, Inc. v. O'Brien*, 839 F.2d 84, 87 (2d Cir.1988). An alternative basis for abstention is a finding of "exceptional circumstances" which justify the refusal to exercise concurrent federal jurisdiction in favor of a parallel state proceeding. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 19–29, 103 S.Ct. 927, 938–44, 74 L.Ed.2d 765 (1982) (*"Cone"*).

### 1. Younger abstention

Defendant DPUC contends that the abstention doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny, including *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432–34, 102 S.Ct. 2515, 2521–22, 73 L.Ed.2d 116 (1982), and *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), require the dismissal of plaintiffs' federal action. Under those cases, abstention is appropriate only if there is an ongoing state judicial proceeding, in which important state interests are implicated, and the party seeking the injunction will have a full and fair opportunity to raise his federal statutory or constitutional arguments in the state forum. *CECOS International, Inc. v. Jorling*, 895 F.2d 66, 70 (2d Cir. 1990), *citing Middlesex, supra*, 457 U.S. at 432, 102 S.Ct. at 2521.

Plaintiffs rely principally on *New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (*"NOPSI"*). In *NOPSI*, the plaintiff public utility company argued that federal law prohibited the defendant ratemaking authority from preventing the plaintiff from passing its full share of federally allocated costs associated with a failed nuclear generating facility along to its customers. *Id.* at 360, 109 S.Ct. at 2514. The Supreme Court found that district court abstention was not proper under either *Younger* or *Burford*.[12]

---

tractual rate freeze dispute from a challenge to a unilaterally imposed, allegedly preempted, state regulation. *Id.* The present plaintiffs' preemption claim is analogous to that presented in *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983), and thus presents a federal question. *See id., citing Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604, *reh. denied*, 431 U.S. 925, 97 S.Ct. 2201, 53 L.Ed.2d 240 (1977).

**12.** The Supreme Court found that *Burford* abstention was not required because (1) adjudication of the federal claim would not require any inquiry beyond the defendant's challenged or-

ders themselves, *Public Util. Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 468–69, 63 S.Ct. 369, 375–76, 87 L.Ed. 396 (1943); (2) the preemption claim was not "entangled in a skein of state law," *McNeese v. Board of Education for Community Unit School Dist. 187*, 373 U.S. 668, 674, 83 S.Ct. 1433, 1437, 10 L.Ed.2d 622 (1963); and (3) the facts of the case did not involve a predominantly local market, and so did

> *not* demand significant familiarity with, and will not disrupt state resolution of, distinctively local regulatory facts or policies. The principles underlying *Burford* are therefore not implicated.

*NOPSI, supra*, 491 U.S. at 364, 109 S.Ct. at 2514–15 (emphasis in original).

In its *Younger* analysis, the *NOPSI* Court found that the state court action was, if viewed in isolation, plainly not the kind of proceeding to which *Younger* applies. *Id.* at 366, 109 S.Ct. at 2517. The Court explained:

[I]t has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States.

*Id.* at 368, 109 S.Ct. at 2518, *citing Colorado River, supra,* 424 U.S. at 817, 96 S.Ct. at 1246. The *NOPSI* defendants argued that the state court action was a continuation of the Council proceeding, so that as long as that initial proceeding qualified for *Younger* treatment the proceeding was not complete until judicial review was completed. 491 U.S. at 368, 109 S.Ct. at 2518. The court disagreed, relying on the traditional distinction between judicial inquiries, which "enforce[ ] liabilities as they stand on present or past facts and under laws supposed already to exist" and legislation which necessarily

looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative and not judicial in kind ... [The proper characterization of an agency's actions] depends not upon the character of the body but upon the character of the proceedings.... The nature of the final act determines the nature of the previous inquiry.

*Id.* at 370–71, 109 S.Ct. at 2519, *quoting Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226–27, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908). Finding that rate-making is an essentially legislative act, the court held that the state court review was not an extension of the legislative process, and that the plaintiff's preemption claim was ripe for review when the defendant Council's order was entered. 491 U.S. at 371, 109 S.Ct. at 2520.

Defendant DPUC argues that federal action here would interfere with or disrupt an ongoing state proceeding that has remained essentially judicial in nature since the finding of a statutory violation was made and a civil penalty imposed.[13] *See Middlesex, supra,* 457 U.S. at 432–34, 102 S.Ct. at 2521–22; *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (error for district court to entertain § 1983 action filed in response to state contempt proceeding, *Younger* not limited to criminal proceedings). The DPUC argues that *NOPSI* is distinguishable because the present order was the product of a judicial proceeding which imposed a penalty for prior conduct under existing laws.

The command that the penalty imposed not be passed on to the plaintiffs' Connecticut subscribers is indistinguishable from the disputed order in *NOPSI,* which constituted "the normal ratemaking step of making NOPSI's shareholders rather than the ratepayers bear the consequences [of the utility's negligence]." *NOPSI, supra,* 491 U.S. at 367, 109 S.Ct. at 2517.[14] Connecticut's electric utility companies have long been subject to such provisions, enacted by the state legislature. *See* Conn.Gen.Stat. §§ 16–19g, 16–19r, 16–19t, 16–19v, 16–19w (prohibiting recovery of nuclear power related costs through electric utility rates).

Defendant DPUC's argument that the disputed order is not an act of ratemaking, and therefore *NOPSI* is distinguishable, re-

---

**13.** The disruptive effect of federal jurisdiction here is limited in that the entire state proceeding itself would not be enjoined; only the preemption issue presented there would be reached in this parallel proceeding. *Cf. Mehta v. Surles,* 720 F.Supp. 324, 329 (S.D.N.Y.1989) (*Younger* abstention inappropriate where federal plaintiff is not seeking to enjoin a parallel state proceeding).

**14.** Conn.Gen.Stat. § 16–41(a), the statute under which the present order was imposed, provides explicitly that any penalty imposed thereunder "shall be excluded from operating expenses for purposes of rate-making."

quires the court to address the merits of the case to determine the appropriateness of *Younger* abstention, and negates the purpose of the doctrine.[15] The burden on defendants to justify abstention under the *Younger* doctrine has not been met. *See CFE, supra,* 660 F.Supp. at 1404.

### 2. Colorado River Abstention

An alternative form of abstention, resting on considerations of "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation," was developed in *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976) (citation omitted). Application of this doctrine requires examination of six factors:

> (1) assumption of jurisdiction over a *res;* (2) inconvenience of the forum; (3) avoidance of piecemeal litigation; (4) order in which the actions were filed; (5) the law that provides the rule of decision; and (6) protection of the federal plaintiff's rights.

*De Cisneros v. Younger,* 871 F.2d 305, 307 (2d Cir.1989). *See Jones, Administratrix v. Aetna,* Civ. No. H89–226(AHN) (D.Conn. Feb. 8, 1990), slip op. at 9–10, *citing Cone, supra,* 460 U.S. at 19–29, 103 S.Ct. at 938–44. This test "is not subject to precise rules, but rather should 'be applied in a pragmatic, flexible manner with a view to the realities of the case at hand.' " *Telesco v. Telesco Fuel and Masons,* 765 F.2d 356, 362 (2d Cir.1985), *quoting Cone, supra,* 460 U.S. at 21, 103 S.Ct. at 940.

[T]he decision whether to dismiss ... does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case.

*Cone, supra,* 460 U.S. at 16, 103 S.Ct. at 937.[16]

> [The] task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist "exceptional" circumstances, the "clearest of justifications," that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction.

*Id.* at 25–26, 103 S.Ct. at 942 (emphasis in original).

The first two factors militate against dismissal, because neither justifies abstention in this case. *See De Cisneros, supra,* 871 F.2d at 307; *Bethlehem Contracting Co. v. Lehrer/McGovern Inc.,* 800 F.2d 325, 327 (2d Cir.1986) (factors which do not support abstention argue in favor of jurisdiction). Defendant OCC argues that the third factor, *i.e.,* the risk of piecemeal litigation, merits abstention in this case.[17] In one sense, the exercise of federal jurisdiction over plaintiffs' preemption claim will fragment the litigation and create a possibility of duplicated efforts and inconsistent results. However, the facts of this case, viewed pragmatically, do not render this

---

**15.** The *NOPSI* order was that the utility could only pass along to consumers only one half of its share of federally allocated costs associated with a troubled nuclear plant. The present order provides that none of the penalty may be passed along. Defendants cite no authority for the proposition that a penalty should be distinguished from a loss due to negligent management. *See NOPSI, supra,* 491 U.S. at 366–367, 109 S.Ct. at 2517.

**16.** For present purposes, it is significant that the *Cone* court went on to say:

> *Colorado River* itself illustrates this principle in operation. By far the most important factor in our decision to approve the dismissal

there was the "clear federal policy ... [of] avoidance of piecemeal adjudication of water rights in a river system," [*Colorado River, supra,* 424 U.S. at 819, 96 S.Ct. at 1247] as evinced in the McCarran Amendment.

*Cone, supra,* 460 U.S. at 16, 103 S.Ct. at 937. Thus, the Congressional intent with respect to the appropriate forum is an important element of the *Colorado River* analysis.

**17.** "Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." *LaDuke v. Burlington Northern R. Co.,* 879 F.2d 1556, 1560 (7th Cir.1989) (citation omitted).

circumstance exceptional. *See Cone, supra,* 460 U.S. at 20–21, 103 S.Ct. at 939–40 (fragmentation of issues is not a factor militating for abstention where federal law requires arbitration of some claims). The preemption issue before the federal court is not inextricably linked to the constitutional and procedural issues raised in the parallel state court proceeding. *See General Reinsurance Corp. v. CIBA–Geigy Corp.,* 853 F.2d 78, 81 (2d Cir.1988) (risk of piecemeal litigation is real where issues presented in parallel proceedings are inextricably linked). As defendant OCC has argued elsewhere in its brief, the preemption claim is distinct from the primary issues to be considered by the state court. Given the structure of the dispute between the parties, the state court would only reach the preemption issue after first disposing of the challenges to both the state statutes and administrative procedures. By that time, a final federal ruling should be in hand, the preclusive effect of which obviates concern over inconsistent or contradictory results. *See Jones, supra,* slip op. at 10. *Cf. De Cisneros, supra,* 871 F.2d at 308 (abstention favored when no conflict will result if state decides issues first, but conflict possible if federal court rules first). *See also Cone, supra,* 460 U.S. at 16, 22–25, 103 S.Ct. at 937, 940–42 (clear federal policy in *Colorado River* was for states to have jurisdiction over such cases, distinguished from *Cone* where federal policy favored fragmentation of such litigation).[18] Thus, the reality of this case is that the risk of duplicated effort and inconsistent, mutually contradictory results is remote.

The fourth factor, the temporal priority of the filing of the state action, does not establish an exceptional circumstance favoring abstention. *See Travelers Indemnity Co. v. Monsanto Co.,* 692 F.Supp. 90, 92 (D.Conn.1988), slip op. at 5–6. Rather the inquiry should be made "in terms of how much progress has been made in the two actions." *Jones, supra,* slip op. at 10, quoting *Cone, supra,* 460 U.S. at 21, 103 S.Ct. at 940. Such an assessment of comparative progress should take into account the proximity of the conclusion of each proceeding. As the pending motions indicate, the federal action is ripe for resolution via summary judgment. At oral argument on April 23, 1990, defendant DPUC indicated that the briefing process in the state court was complete, so that the case should likely be assigned to a judge within thirty to sixty days. The relative progress of the proceedings is thus not a circumstance favoring abstention.

■ With respect to the last factor, the rule of decision for plaintiffs' preemption claim is provided by the Supremacy Clause of the U.S. Constitution, and involves an interpretation of Congressional intent as provided in the Cable Act of 1984. *See Environmental Encapsulating Corp. v. New York City,* 855 F.2d 48, 53 (2d Cir.1988). Although a claim of federal preemption is not of itself sufficient to prevent abstention, abstention is inappropriate where federal law governs and no difficult questions of state law are presented. *De Cisneros, supra,* 871 F.2d at 308; *Connecticut Air Service, Inc. v. City of Danbury,* Civ. No. B87–667(WWE) (D.Conn. October 7, 1989), slip op. at 3. *See Ducommun Inc. v. Microtech Int'l, Inc.,* Civ. No. N87–432(TFGD) (D.Conn. January 5, 1988), slip op. at 2 (simple absence of federal law issues does not favor abstention). *Cf. Jones, supra,* slip op. at 8–9, 11 (abstention appropriate where state law provides the exclusive rules of decision and is an issue of first impression). The focus of the federal litigation is a challenged order of the DPUC, the state law issues are circumscribed by the four corners of that document, and no procedural, constitutional, or administrative law questions are presented to this court. *See NOPSI, supra,* 491 U.S. at 362, 109 S.Ct. at 2515 (no undue intrusion into state government is present

---

**18.** In the present case, the purposes of the Cable Act upon which plaintiffs rely include the prohibition of unnecessary local regulations which might burden the industry. 47 U.S.C. § 521(6). Although the state forum is fully capable of fairly adjudicating plaintiffs' preemption claim, the Congressional intent to deregulate the cable industry renders this case closer to the facts of *Cone* than of *Colorado River.* *See* note 16 *supra.*

where no inquiry beyond four corners of defendant's rate order).

As none of the first five *Cone* factors favor abstention, there is no need to consider any possible negative impact of abstention on plaintiffs' rights. The interests of judicial economy, in the absence of any "exceptional circumstances" such as those required by *Cone*, are simply not sufficient to relieve this court of its "virtually unflagging obligation ... to exercise the jurisdiction given ..." *Colorado River, supra,* 424 U.S. at 817, 96 S.Ct. at 1246.

### B. Cross–Motions for Summary Judgment

#### 1. Standard for Summary Judgment

Under Fed.R.Civ.P. 56(c), summary judgment shall be granted when a review of the entire record, resolving all ambiguities and drawing all inferences in favor of the nonmoving party, demonstrates "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Donahue v. Windsor Locks Bd. of Fire Commissioners,* 834 F.2d 54, 57 (2d Cir.1987); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). "To defeat a motion for summary judgment a [party] must offer 'concrete evidence from which a reasonable juror could return a verdict in his favor.'" *Cinema North Corp. v. Plaza at Latham Associates,* 867 F.2d 135, 138 (2d Cir.1989) (citation omitted). A motion for summary judgment provides each party an opportunity to demonstrate that the opposing parties' claims and

defenses have no factual basis. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

#### 2. Preemption

The critical question in any preemption analysis is always whether Congress intended that legislation to supersede state law. *Louisiana Public Service Comm'n v. F.C.C.,* 476 U.S. 355, 369, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). *See also Environmental Encapsulating, supra,* 855 F.2d at 53; *DelCore v. W.J. Barney Corp.,* Civ. No. H88–752(AHN) (D.Conn. December 5, 1989), slip op. at 10 (where state statute may frustrate realization of Congressional objectives, focus is on "consequences of applying state law in light of the policies and goals of the otherwise applicable federal law," *citing Pacific Gas & Electric Co. v. Energy Resources Comm'n,* 461 U.S. 190, 220–23, 103 S.Ct. 1713, 1730–32, 75 L.Ed.2d 752 (1983)). However, a court should not lightly assume that Congress intended to preempt state legislation. *Waite v. O'Neill,* Civ. No. N85–418 (JAC) (D.Conn. June 30, 1988), slip op. at 10, *citing Jones v. Rath, supra,* 430 U.S. at 525, 97 S.Ct. at 1309.

The pending motions for summary judgment require an analysis of the Cable Act, and the Congressional intent therein, in order to determine whether a dispute exists as to any genuine issue of material fact concerning the preemptive effect of the Act on the DPUC order. Plaintiffs' preemption claim relies on the plain language of three sections of the Cable Act, namely 47 U.S.C. §§ 541(c),[19] 543,[20] and 556(c),[21] as well as

**19.** 47 U.S.C. § 541(c) provides:
 Any cable system shall not be subject to regulation as a common carrier or utility by reason of providing any cable service.

**20.** 47 U.S.C. § 543, entitled "Regulation of rates," provides in pertinent part:
 (a) *Limitation on regulatory power of Federal agencies, States, or franchising authorities*
 Any Federal agency or State may not regulate the rates for the provision of cable service except to the extent provided under this section. Any franchising authority may regulate the rates for the provision of cable service, or any other communications service provided over a cable system to cable subscribers, but only to the extent provided under this section.

 (b) *Promulgation of regulations; scope; contents; periodic review and amendment*
 (1) Within 180 days after October 30, 1984, the Commission shall prescribe and make effective regulations which authorize a franchising authority to regulate rates for the provision of basic cable service in circumstances in which a cable system is not subject to effective competition....

**21.** 47 U.S.C. § 556(c) provides:
 Except as provided in section 557 of this title [regarding existing franchises], any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by

cases concerning preempted state regulation of oil prices. *See Mobil Oil Corp. v. Dubno,* 492 F.Supp. 1004, 1013 (D.Conn. 1980), *aff'd in part & appeal dismissed in part,* 639 F.2d 919 (2d Cir.), *cert. denied,* 452 U.S. 967, 101 S.Ct. 3122, 69 L.Ed.2d 980 (1981) (*"Dubno"*); *Mobil Oil Corp. v. Tully,* 499 F.Supp. 888, 895 (N.D.N.Y.1980), *aff'd in part & appeal dismissed in part,* 639 F.2d 912 (2d Cir.), *cert. denied sub nom. Tully v. New England Petroleum Corp.,* 452 U.S. 967, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981) (*"Tully"*). Defendants respond that the preemptive effect of the sections at issue is open to interpretation because the operative phrase in § 543(a), "rates for the provision of services", is not defined. *See Housatonic Cable Vision Co. v. Department of Public Utility Control,* 622 F.Supp. 798, 808 (D.Conn.1985). To the extent that the plain language of the Cable Act is not conclusive, the preemptive effect of the Cable Act should be determined by consideration of (1) the context in which the allegedly preemptive sections are set; (2) the legislative history of the statute as a whole and the preemptive sections in particular; and (3) cases interpreting the preemptive effect of similar federal statutes.

### a. Statutory Context

■ The Cable Communications Policy Act of 1984 ("Cable Act") established a regime of shared state and federal regulatory authority over the cable television industry. *City of New York v. F.C.C.,* 486 U.S. 57, 59, 108 S.Ct. 1637, 1639, 100 L.Ed.2d 48 (1988) (*"NYC"*); *Channel One Systems v. Connecticut Department of Public Utility,* 639 F.Supp. 188, 194–95 (D.Conn.1986); *Housatonic, supra,* 622 F.Supp. at 806. The enumerated purposes of the Cable Act include "establish[ment of] a national policy concerning cable communications," "establish[ment of] guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems," and "minimiz[ation of] unnecessary regulation that would im-

pose an undue economic burden on cable systems." 47 U.S.C. § 521(1), (3), (6). As the court observed in *Channel One, supra:*

> The Cable Act changed the regulatory structure of the cable television industry, establishing a comprehensive scheme for the regulation of cable services at the federal, state, and local levels. Consistent with Congress' intent, the Cable Act vests states with authority to regulate cable television through the franchise process.

639 F.Supp. at 194–95 (footnote omitted). *See also Housatonic, supra,* 622 F.Supp. at 807 n. 5. Under the Act, state or local franchising authorities retain the authority to enforce requirements contained within franchises, particularly as they relate to the provision of services and the imposition of costs for those services. *See, e.g.,* 47 U.S.C. §§ 544(c) (enforcement authority for pre-existing franchises), 551 (protection of subscriber privacy), 552 (consumer protection), 554 (equal employment opportunity), 556 (coordination of governmental authorities).

Defendant OCC relies upon two cases— *Housatonic, supra,* 622 F.Supp. at 807–08 (upholding state franchising authority requirement of line extensions without imposition of costs directly on affected customers) and *Comcast Cablevision of Sterling Heights Inc. v. City of Sterling Heights,* 178 Mich.App. 117, 443 N.W.2d 440 (Ct. App.1989) (franchisor's regulation of premium service disconnect fee held not to be prohibited rate regulation under Cable Act)—for the proposition that Congress did not intend to preempt state regulations which constrain cable operators' freedom to charge their customers as they please.

In *Housatonic,* the Congressional purposes of maximizing the availability of cable services and prohibiting discrimination among customers were relied on to find that the Cable Act does not preempt state regulation of line extension charges. *Id.* at 811–12. In *Sterling Heights, supra,* 443 N.W.2d at 442–43, the franchisor's authori-

such authority, which is inconsistent with this chapter shall be deemed to preempted and superseded.

ty to regulate premium service disconnect fees was predicated on the fact that a disconnect fee is not a charge for the provision of service, but rather a fee imposed upon the cancellation of service. Both of these rulings distinguished specific, occasional charges, levied on a subgroup of customers, from rates for the provision of service which are charged to all customers. *Id.* at 442–43; *Housatonic, supra,* 622 F.Supp. at 808. No such distinction is at issue in the present case. The effect of the disputed order will be on the monthly rates charged to all customers for basic cable service. Thus, the cases discussing the legislative context of § 543 provide no support for defendants' contention that the disputed order is not expressly prohibited by the Cable Act. Under the reasoning applied in both *Housatonic* and *Sterling Heights,* the DPUC order is indistinguishable from a rate-making regulation.

### b. Legislative History

The Cable Act explicitly has delegated rulemaking authority, in the area of rate regulation, to the F.C.C. 47 U.S.C. § 543; *American Civil Liberties Union v. F.C.C.,* 823 F.2d 1554, 1559 (D.C.Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988) (*"ACLU"*). The F.C.C. regulations prohibit regulation by defendants of the rates plaintiffs charge for the provision of cable services.[22] Defendants contend that the preemptive effect of the Cable Act does not extend to a prohibition of a civil penalty being passed along to Connecticut cable subscribers. However, the legislative history of the Act indicates that rate regulation for the purpose of either enforcing franchise provisions or insuring reasonable rates is precisely what the Congress sought to preempt.

In enacting the Cable Act of 1984,

Congress purported to "establish a national policy concerning cable communications" and to "minimize unnecessary regulation that would impose an undue economic burden on cable systems." 47 U.S.C. §§ 521(1), (6) (1982 ed., Supp. IV). The Act was also intended to "establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems" through procedures and standards that "encourage the growth and development of cable systems and which assure that cable systems are responsive to the needs and interests of the local community." §§ 521(3), (2) (1982 ed., Supp. IV).

*NYC, supra,* 486 U.S. at 61, 108 S.Ct. at 1640–41. *See also ACLU, supra,* 823 F.2d at 1559 (Congress concerned both with relieving the cable industry from unnecessary, burdensome regulation and with ensuring responsiveness to needs of the public).

A comprehensive discussion of both the ends and means of the Cable Act is provided by the House of Representatives Energy & Commerce Committee. H.R. No. 98–934, 1984 U.S.Code Cong. and Admin.News 4655. The Committee Report discusses the history of cable regulation by local, state, and federal actors, and the describes the mechanism for establishing a clear division of authority consistent with the legislation's goals:

### Rate Regulation

When cable television first developed essentially as an antenna service to provide better reception in rural and suburban areas of over-the-air broadcasts, many cities began regulating the rates charged to subscribers to the system. This regulation, tied to the cable system's use of city streets, was a condition

---

**22.** As promulgated by the F.C.C., the applicable regulations mandate that "[o]nly cable systems that are not subject to effective competition may be rate regulated." 47 C.F.R. § 76.33 (1988). Effective competition has been defined as the availability of three broadcast channels at a certain reception quality level within the general area in which service is provided. *See ACLU, supra,* 823 F.2d at 1564. *See also NYC, supra,* 486 U.S. 57, 108 S.Ct. 1637. Plaintiffs' assertion

that effective competition exists in the pertinent parts of Connecticut (*See* Nessler Aff't ¶ 4) has not been challenged by defendants, and so will be taken as granted. *See also* Conn.Gen.Stat. § 16–331(a) ("The department may issue more than one ... certificate [of public convenience and necessity] for any franchise area or portion of a franchise area"); *Channel One, supra,* 639 F.Supp. at 196.

on the grant of a franchise to construct cable facilities. It was seen as a means to prevent cable operators from charging unreasonably high rates for what was seen as an "essential" service in these areas. In addition, cities viewed the ability to deny or delay a requested rate increase as a useful tool for a city to enforce key provisions of a franchise agreement, such as the obligation to provide service to all residents of the service area. As cable television expanded both its services and the areas which it served, rate regulation remained an important component of the franchise process.

The cities have not, however, exercised this rate regulatory authority in a vacuum. Since the late 1970s, the FCC has preempted state and municipal regulation of the rates for pay cable services (e.g., HBO), limiting rate regulation to the provision of "basic" cable services.... Recently, however, the FCC preempted regulation of the rates for any cable services other than the retransmission of local television broadcast signals and the provision of public, educational and governmental access channels, and allowed operators to retier services not subject to regulation independent of municipal review.... (citation omitted).

In addition to municipal and FCC involvement in rate issues, a number of states, including California and Massachusetts, have passed laws to deregulate the rates charged for basic cable. In Massachusetts, for instance, basic cable is deregulated in communities with at least four television signals available off the air.

H.R. 4103 contains provisions to address two important issues with regard to rate regulation. First, it establishes and clarifies municipal authority for rate regulation. It specifies a four-year period in which, essentially, existing municipal rate authority over "basic cable service" will remain in effect. At the end of this period, municipal authority to regulate basic cable rates turns on whether a cable system faces effective competition in its market, as determined by the FCC. The Committee believes that the availability of competing sources of programming in a given market will keep the rates for basic cable services reasonable in that market without the need for regulation. A franchising authority should be granted authority to regulate rates for basic cable service only in circumstances in which a cable system is not subject to effective competition....

H.R. No. 98–934, 1984 U.S.Code Cong. and Admin.News 4661–62.

The Committee Report demonstrates that Congress considered the historical and equitable arguments in favor of local rate regulation,[23] and rejected them in favor of a uniform federal standard. The twin goals of deregulation and local control of services were reflected in a division of authority that terminated all local rate regulation authority. The significance of section 541(c), which prohibits regulation of cable systems as utilities, is that "[a] cable system would not, for instance, be subject to rate of return regulation ..." *Id.* at 4697. Thus, to the extent that the DPUC Decision is a form of rate of return regulation which has been imposed to enforce the authority of the local franchising body and assure that subscribers pay only reasonable rates, it was the plain intent of the Congress to preempt such regulation.

### c. Analogous Preemption Cases

The final source of authority as to the preemptive effect of the Cable Act is provided by cases which discuss the preemptive effect of similar federal statutes and

---

**23.** Defendant DPUC's argument that plaintiffs should be treated as if they have monopolistic powers is belied by the FCC's definition of effective competition. *See also Quincy Cable TV, Inc. v. F.C.C.,* 768 F.2d 1434, 1450 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986) (rejecting argument that cable operators are in a position to exact monopolistic charges, and finding no meaningful distinction between cable TV and the newspaper industry with respect to First Amendment freedom from government intrusion based on economic factors). *See* note 22 *supra.*

interpret regulations similar to the present order.

As previously mentioned, plaintiffs have cited the *Dubno* and *Tully* decisions, which held that federal petroleum pricing statutes preempted state laws which prohibited the pass through of gasoline taxes to retail purchasers. Similar cases have arisen concerning the recovery from retail electricity purchasers of costs associated with troubled nuclear energy plants. *See NOPSI, supra; Mississippi Power & Light Co. v. Mississippi,* 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988); *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 970, 106 S.Ct. 2349, 2359, 90 L.Ed.2d 943 (1986) ("[w]hen [the Federal Energy Regulatory Commission] sets a[n interstate] rate between a seller of power and a wholesaler-as-buyer, a State may not exercise its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate ... Such a 'trapping' of costs is prohibited.").

The effect of the state regulations in the above-cited cases was consistently one of "trapping" costs so that they were not passed on to retail customers. In both *Dubno* and *Tully,*

> ... it was the express purpose of the [state] legislature[s] ... that the tax "[not] be construed as a tax upon the purchasers of petroleum products" and, thus, "such tax shall constitute a part of the operating overhead of such companies."

*Dubno, supra,* 639 F.2d at 922. In *Dubno,* the legislative history of the 1975 amendments to the federal Emergency Petroleum Allocation Act ("EPAA") was reviewed, and the amendments were held by the district court to "constitute an affirmative federal decision that EPAA objectives required the price of such product to be set by a free market." *Dubno, supra,* 492 F.Supp. at 1012. The court explained:

> It is within neither this court's realm nor its competence to evaluate the wisdom of federal energy policy, nor the economic theories that underlie it. Suffice it to say, the question whether the

plaintiffs could "afford" to bear alone the tax imposed by [the Connecticut statute] ... is irrelevant to the decision in this case, as are arguments proffered by the amici who contend that the tax cost could and ordinarily would be spread throughout the several states. But inasmuch as [the Connecticut statute] ... contravenes the federal policy by attempting to regulate the price that may be charged in Connecticut for the affected petroleum products, that provision cannot stand.

*Id.* at 1014–15 (footnotes omitted).

The effect of the instant order is to export the costs of enforcing Connecticut's cable franchise regulations; it is precisely the type of state regulation that Congress has preempted in the fields of natural gas and petroleum pricing. *See National Fuel Gas Supply Corp. v. Public Service Comm'n of the State of New York,* 894 F.2d 571, 575–79 (2d Cir.1990) (duplicative state environmental review would delay or prevent federally approved construction, with increased costs to be paid by utility consumers in other states); *Mobil Oil Corp. v. Tully,* 653 F.2d 497, 501 (Em.App.1981) (state tax which increases costs to purchasers in other states contravenes federal goal of equitable pricing); *Mobil Oil Corp. v. Karbowski,* 667 F.Supp. 927, 935 (D.Conn.1987) (nationwide uniformity would be compromised and frustrated by application of state law which contravenes federal statute).

Defendants seek to distinguish these cases on the grounds that they did not involve a negligently incurred one-time penalty which may fairly be charged to the shareholders rather than the subscribers. The proper focus for an analysis of a preemption claim concerning a state regulation which seeks to "trap" negligently incurred costs and charge them to a utility's shareholders was discussed by the *NOPSI* court:

> [T]he appropriate question here is not whether Louisiana has a substantial, legitimate interest in reducing NOPSI's retail rate below that necessary to recover its wholesale costs, but whether it has a substantial, legitimate interest in regu-

lating intrastate retail rates. It clearly does.

*NOPSI, supra,* 491 U.S. at 365, 109 S.Ct. at 2516. Unlike the defendant utility commission in *NOPSI,* the DPUC has no authority to regulate intrastate rates for the provision of cable service.

The order "trapping," and thereby exporting, the costs of the penalty imposed on the plaintiffs is indistinguishable in both purpose and effect from rate regulations held preempted under analogous, less precisely worded federal statutes. *See Public Utilities Comm'n, supra,* 317 U.S. at 467, 63 S.Ct. at 375. Defendants have cited no authority which distinguishes the equitable enforcement power of the DPUC from the regulatory powers held preempted in the petroleum and utility cases. Thus, under the Cable Act, the defendant DPUC may not prevent plaintiffs from charging some or all of their civil penalty costs to their Connecticut customers.

### III. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss, construed as motions for summary judgment, are denied, under the doctrines of *Younger v. Harris* and *Colorado River.* On the issue of preemption, plaintiffs' motion for summary judgment is granted and defendant DPUC's motion for summary judgment is accordingly denied.

*See* 28 U.S.C. § 636(b) (written objections to ruling must be filed within ten days after service of same); F.R.Civ.P. 6(a), 6(c) & 72; Rule 2 of the Local Rules for United States Magistrates, United States District Court for the District of Connecticut; *Small v. Secretary, H & HS,* 892 F.2d 15, 16 (2d Cir.1989) (failure to file timely objection to Magistrate's recommended ruling may preclude further appeal to Second Circuit).

Dated at New Haven, Connecticut, this 4th day of May, 1990.